...

KEANE & MARLOWE, LLP
Attorneys for Defendants
REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION LLC
197 Route 18 South Suite 3000
East Brunswick, New Jersey 08816
(732) 951-8300
Mary Ann C. Marlowe (MM-0723)
Christopher P. Keane (CPK-4394)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DEVAL DENIZCILIK VE TICARET A.S.,

                          Plaintiff,

-against-

REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION
LLC.,

                          Defendants.
-------------------------------------------------------------x

**AFFIDAVIT OF MYLES A. SUNLEY**

**07 Civil 3397 (JGK)**

**ECF CASE**

**MYLES A. SUNLEY**, being duly sworn, deposes and says:

1. I am a Senior Claims Adjuster of the C.R. O'Farrell Syndicate (Lloyd's Syndicate No. COF 1036) ("Syndicate 1036") at Plantation Place, 30 Fenchurch Street, London EC3M 3BD.

2. I am duly authorized by Syndicate 1036 to make this Affidavit in support of the application brought by Repinter International Shipping Co. S.A. and Miachart Corporation, LLC., ("Repinter/Miachart"), the Defendants/Charterers in the above-captioned action to have the attachment released against a Letter of Undertaking put up by Syndicate 1036.

3. I make this Affidavit based upon the facts and matters within my personal knowledge and upon the information provided to me by Defendants' English and United States counsel, namely, Reed Smith Richards Butler LLP and Keane and Marlowe, LLP, respectively.

4   I understand that the Plaintiff in this action Deval Denizcilik Ve Ticaret A.S. ("Deval" or "Owners") has questioned the sufficiency of a letter of undertaking ("LOU") dated 22nd May 2007 put up by the Syndicate to secure an alleged breach by Repinter/Miachart of their charter obligations and lift the attachment.

5   I am advised that the challenge to the LOU was made initially on the basis that Syndicate 1036 is in run-off.

6   I am told this was based on a discussion Owners' London lawyers allegedly had with a Lloyd's broker, whom they have refused to name.

7   That allegation, as stated in my recent letter to your Honor, is completely untrue (Copy of my recent letter to your Honor attached hereto as Exhibit 1),

8   I am advised further that Owners' more recent challenge has been made on the basis that there are allegedly "questions" (in Owners' lawyers' minds at least) over the ability of the corporate member of Syndicate 1036, QBE Corporate Ltd, to honour the LOU if called upon to do so in the event that Owners prevail on the merits in the London arbitration, and in any appeal, in the event of an appeal.

**THE STRUCTURE OF SYNDICATE 1036**

9   Syndicate 1036 is an underwriting syndicate operating in the Lloyd's Market in London. We are part of the QBE insurance Group ("QBE").

10   QBE is one of the top 25 insurers and reinsurers worldwide, and is publicly listed on the Australian Stock Exchange.

11   QBE is Australia's largest international general insurance & reinsurance group, which operates in all key insurance markets, has offices in 44 countries, and employs more than 7,900 staff worldwide.

12   One of the key insurance markets within which QBE operates is the Lloyds market in London, which is still the world's single biggest market for the insurance of marine liabilities.

13   QBE's operations at Lloyds are spread over 5 syndicates, each underwriting a different class of risk, all grouped under an umbrella syndicate, Syndicate 2999, as set out in the table below:

| Lloyds Syndicate No: | Class of risk underwritten | Underwriter | Underwriting Capacity for 2007 (USD) |
|---|---|---|---|
| 566 | Reinsurance | Jonathan Parry | 482.65 million |
| 1036 | Marine & energy | Colin O'Farrell | 433.4 million |
| 1886 | Non-marine liability | John Neal | 68.95 million |
| 2000 | Non-marine property, casualty & specialty | David Woodruff | 384.15 million |
| 5555 | Aviation | Emilio Di Silvio | 167.45 million |
| **Total underwriting capacity for 2007: US$1.53 billion** | | | |

14  Umbrella Syndicate 2999 does not itself underwrite risks in its own right, but is the focal point for reporting management control and administration of the five trading sub-syndicates. Syndicate 2999 is managed by Limit Underwriting Limited ("Limit"), one of the largest agents at Lloyd's.

15  All the US$1.53 billion in underwriting capital provided across these 5 syndicates is provided by the corporate member of each syndicate, QBE Corporate Ltd, a company incorporated in England. Like most other Lloyds syndicates, and in accordance with good underwriting practice, the risks underwritten by the 5 syndicates are also mostly re-insured.

16  I should point out that the convention in legal proceedings brought against Lloyd's syndicates is that these are brought against the members of the syndicate (dating from the days when Lloyd's syndicates were made up of natural persons, rather than backed by

large corporate entities). As the current version of the LOU makes clear, (which I understand Owners' lawyers have agreed in principle), any action to enforce its terms is to be brought against *"QBE Corporate Ltd on behalf of all the members of Syndicate 1036"*. (Exhibit 2)

17   The security this gives the Owners is that they have a direct action against the corporate member backing all of QBE's Lloyds syndicates, in the event the LOU should, for some reason, be dishonoured.

**THE CHARTERERS' LIABILITY COVER PROVIDED BY SYNDICATE 1036.**

18   Syndicate 1036 was established in 1987 and has an underwriting capacity of US$433.4 million for 2007.

19   As stated above, Syndicate 1036 underwrites the cover placed by QBE in the marine and energy sectors.

20   One of the marine risks underwritten by Syndicate 1036 is charterers' liability cover – in other words, we provide insurance for charterers of vessels when claims are made against them by shipowners on the basis that charterers were in breach of their charterparty obligations – the very type of claim made by Owners in this action.

21   The charterers' liability cover provided by Syndicate 1036 is arranged by our agents, Michael Else & Co, under the brand name "The Charterers P&I Club".

22   I also understand that a negative reference was made at the June 1, 2007 hearing in this matter to "The Charterers' P&I Club" being a "brand name" for charterers liability and defense costs insurance offered by Syndicate 1036. While this is true, I do not see why any adverse inference should be drawn from this.

23   Michael Else started the Charterers Mutual Assurance Association Limited in 1986. This was managed by Michael Else as a mutual P&I Club (commonly known as The Charterers' P&I Club) until the members made the decision to turn the club into a fixed premium insurance. Market backing was sought and the Club demutualised in January 1999 and has been run successfully thereafter as a fixed premium insurance with 100 percent Lloyds backing. This remains the situation today.

24   The Club is still operated by Michael Else as the underwriting agents with the same service ethos as if it were a mutual P&I Club and retains a worldwide network of

correspondents to assist its clients/assureds – but with the full financial backing provided by the Lloyd's markets (where most mutual P&I Clubs re-insure in any event).

25   Michael Else & Co have a Power of Attorney issued on February 20, 2007 (copy attached hereto as Exhibit 3), to issue security and handle charterers' liability claims on the Syndicate's behalf. That POA is valid for a year and has not been revoked, as we have confirmed to Owners in writing (Exhibit 4). Thus, Michael Else still retains the authority of Syndicate 1036 to issue the LOU in question, on behalf of the Syndicate and its corporate member.

26   It is Syndicate 1036 on whose behalf the LOU has been issued and who will respond to the formal payment demands as appropriate following any final, uanppealable arbitral decision, final judgment on appeal (in the event of an appeal) or other agreement reached between the parties.

## THE STRENGTH OF SECURITY FURNISHED BY SYNDICATE 1036

27   One of the benefits of charterers' liability cover is that policy holders are entitled, in return for their premiums to have claims falling within the scope of the cover secured. The benefit to shipowners is that they are not reliant on their charterers' continuing solvency to meet any potential award or judgment owners may obtain against them. As such, charterers' liability cover plays an important role in facilitating the growth of maritime commerce and international trade.

28   The reputation of Lloyd's for first-class security is recognised by three leading independent international ratings agencies, A.M. Best, Fitch and Standard & Poor's, which rate Lloyd's A (Excellent), A (Strong) and A (Strong) respectively.

29   Security provided by Lloyd's underwriters, such as the LOU at issue in this action, is accepted worldwide, without challenges of the kind now raised by Owners, to lift marine liens, arrests and attachments such as that which was issued pursuant to this Court's April 30, 2007 Order of attachment.

30   LOU's issued by Lloyds syndicates are backed by 3 levels of security:

   (a)   Syndicate Level Assets

   (b)   Members' Funds

    (c)    Lloyds Central Assets

I explain each level briefly below:

*Syndicate Level Assets*

31    All premiums received by a syndicate – such as those paid by Repinter and Miachart to obtain their charterers' liability cover, are held in trust for the protection of policyholders. These liquid assets are available to meet claims and other underwriting liabilities of the member (i.e. QBE Corporate Ltd in the case of Syndicate 1036). Under the Lloyd's Rules, QBE Corporate Ltd is obliged to ensure that there are sufficient funds in the premiums trust fund for syndicate 1036 to meet all claims and all necessary and reasonable expenses and outgoings in connection with the syndicate business. Assets are liquid in nature to ensure that liabilities can be met as they fall due.

32    Other than paying claims, premiums trust funds can be used only to meet permitted expenses and outgoings, for example, reinsurance premiums and underwriting expenses. Profits are not released until full provision has been made for estimated underwriting liabilities.

33    This forms the first link in the Lloyd's chain of security.

34    I have asked the QBE Compliance Department to collate the data for all the syndicate level assets held worldwide and will ensure that this is placed before the Court as soon as the information has been tabulated.

*Members' funds*

35    In addition to the syndicate level assets, all members, including QBE Corporate Ltd, are required to hold additional capital at Lloyd's as further security for their underwriting. The amount of capital required in respect of each member is independently determined by Lloyds in accordance with Lloyd's Individual Capital Assessment capital-setting framework. The capital is provided as funds at Lloyd's, which are held in trust as security for the protection of policyholders and other insurance business creditors of the member. To qualify for inclusion, these assets must be readily realisable. They include cash, securities, letters of credit, and bank and insurance company guarantees.

36    This forms the second link.

37   I have also asked the QBE Compliance Department to collate the data for all the Members' Funds held worldwide and will ensure that this is placed before the Court as soon as the information has been tabulated.

*Lloyds Central Assets*

38   Finally, Lloyd's has established a Central Fund which is available, at the discretion of the Council of Lloyd's, to meet any portion of any member's liabilities that the member is unable to meet in full. These assets are held on a mutual basis. This, and other central assets of the Society, constitute the third link in Lloyd's chain of security.

39   Syndicate 1036 is also required by Lloyds to estimate all future liabilities, which are reviewed on an annual basis by an independent actuary. In addition, Lloyds requires its members to recapitalize at least twice a year to cover their capital requirement and any losses suffered.

**THE RESOURCES AVAILABLE TO QBE CORPORATE LTD**

40   Further to Owners' challenge to the solvency of the syndicate's corporate Member, I attach a copy of the most recent accounts filed by QBE Corporate LTD at Companies house on 31 December 2005 (Exhibit 5). The accounts for the year ending 31 December 2006 will be finalised in July, for release in August. I respectfully draw the Court's attention to the following aspects of the most recent figures currently available:

(a)   QBE Corporate's 31 December 2005 balance sheet shows that QBE Corporate Ltd had cash in bank and in hand of GBP46,108,000 (over US$90 million at current rates of exchange), in addition to

(b)   US$70.2 million invested in shares and other variable yield securities, and

(c)   US$1.067 billion invested in debt securities and other fixed interest securities, and

(d)   US$9.9 million in deposits with credit institutions (see note 11 to the attached financial statements on p. 16).

41  I point out that these assets considerably exceed the free reserves of Owners' own P&I Club, the UK P&I Club. According to its May 2007 circular, the UK P&I Club had comparatively modest free reserves of only US$263 million (Exhibit 6).

**CONCLUSION**

42  In conclusion, I respectfully submit that there cannot be any genuine doubt concerning the sufficiency of a Letter of Undertaking put up on behalf of Syndicate 1036 as substitute security for the funds currently restrained pursuant to this Court's April 30, 2007 Order of attachment, or for Rule B attachments generally.

_____
Myles A. Sunley

Sworn this 15th day of June 2007   WITHOUT ANY EXHIBITS ATTACHED.

At  London

Before me _____
Solicitor/Commissioner for Oaths

```
BARLOW LYDE & GILBERT LLP
BEAUFORT HOUSE
15 ST. BOTOLPH STREET
LONDON, EC3A 7NJ
```