BBT TRADESHIPS LLC
2115 Linwood Avenue
Fort Lee, NJ 07024



# Time Charter

### GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  *This Charter Party,* made and concluded in  Fort Lee, New Jersey, on the 13th.......................... day of *April 2006*................. ~~19~~..........
2  Between *Deval Denizcilik ve Tic. A.S., Istanbul*................................................................................................................................
3  Owners of the good *Turkish Flag*......................... {~~Steamship/Motorship~~} M./V "Orhan Deval" (see Clause 53).................... of............................
4  of *16,605*................... tons gross register, and *9,208*........................................ tons net register, ~~having engines of~~ ......................~~indicated horse power~~
5  and with hull, machinery and equipment in a thoroughly efficient state, ~~and classed~~ ...................................................................
6  ~~at~~ .......................of about *1,224,212 / 1,180,146*.................. cubic feet *grain*/bale capacity, and about *27,562 metric tons*........................ ~~tons of 2240 lbs.~~
7  deadweight capacity  ~~(cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~
8  ~~allowing a minimum of fifty tons)~~ on a draft of *9.765 meters*....... ~~feet~~ ............ ~~inches~~ on ...................................... Summer freeboard, inclusive of permanent bunkers,
9  ~~which are of the capacity of about~~........................................~~tons of fuel~~, and capable of steaming *throughout the currency of this Charter*, fully laden, under good weather
10  conditions about *12.5* knots on a consumption of about *21 metric tons IFO 180 CST and about 0.2 metric tons GO at sea (see Clause 53)* ~~tons of the best Welsh coal-best grade~~
    ~~fuel oil-best grade Diesel oil,~~
11  now *vessel ETB 19/20 April and ETC/S 24/25 April weather permitting*, ..................................................................................
12  and *Messr. Repinter International Shipping Company SA, Guatemala, fully guaranteed by Messr. Miachart Corporation LLC, Miami, Florida*, Charterers ~~of the City of~~
13  *Witnesseth,* That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  ~~about~~ *one (1) period time charter of about 9 to 12 months plus or minus 15 days in Charterers' option, trading always via safe berth(s) and or safe anchorage(s) in safe port(s),*
15  *always afloat worldwide, always within Institute Warranty Limits,* ............................................................................. within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, ~~at~~ *on DOP Brunswick/USEC any time day or night, Sundays and holidays included,* ..................................
19  ..................................................................................................................................................................................................
20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on ~~her delivery~~ *arrival first load port* to be
22  ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, *failing which the vessel will be placed off hire to the extent*
    *Charterers' operations are hindered,* having water ballast, winches and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, ~~including petroleum or its products, in proper containers,~~ excluding *see Clause 66*..............................................................................
26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America~~ ....................................................................................................................~~and/or Europe~~
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32  *Trading Exclusions - see Clause 65*...........................................................................................................................................
33  ..................................................................................................................................................................................................
34  ..................................................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:

36  1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull *and cargo spaces*, machinery and equipment for and during the service.
39  2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, *garbage removal and watchmen where compulsory always for Charterers' account,* Commissions, *tallymen, stevedores, municipality and state taxes,*
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses, *including any taxes/dues on cargo/freight,* except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited *prior delivery under this Charter Party to be for Owners' account but those ordered because of cargo(es) carried or ports visited* while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. ~~Charterers to have the privilege of using shifting boards~~
47  ~~for dunnage, they making good any damage thereto.~~
48  3. *See Clause 30.* ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ............... ~~tons and not more than~~
50  ............... ~~tons and to be re-delivered with not less than~~............... ~~tons and not more than~~............... ~~tons.~~
51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 10,200.00 per day/pro rata including overtime*............
52  ............... ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53  ~~stores, on~~ ............... ~~summer freeboard, per Calendar Month,~~ commencing on and from *the hour of* the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day of her re-delivery in like good order and condition *(see Clause 57)*, ordinary
55  wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot at one safe port in Charterers' option Boston/Buenos Aires range*
56  *or in Charterers' option Casablanca/Durban range or in Charterers' option Skaw/Black Sea range, any time day or night Sundays and holidays included,* unless otherwise mutually agreed. Charterers are to give Owners not less than *see Clause 42* days
57  notice of vessels expected date of re-delivery, and probable port.
58  5. Payment of said hire to be made *to Owners' bank* ~~in New York~~ *as per Clause 52* in cash in United States Currency, ~~semi-monthly~~ *15 days* in advance, and for the last ~~half month~~ *15 days* or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire *or any other undisputed amounts due to Owners under this Charter*, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~
63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~
65  ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
66  ~~to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67  ~~of such advances.~~
68  6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or ~~place~~ *safe anchorage* that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~
70  ~~lie aground.~~
71  7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations, *if available,* for Supercargo *which to be always at Charterers' risk and expense*, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74  ~~paying Owners~~ ............... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~
76  8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim, *lash/unlash, chock, dunnage, secure, tally* and discharge the cargo at their *risk and* expense under the supervision of the

79 Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a ~~Supercargo~~ *Port Captain*, who shall accompany the vessel *between the ports within the same country/region-area only provided local rules/laws permit, which to be always at Charterers' risk/expense,* and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of ~~$1.00~~ *USD 15.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the current rate per meal~~, for all such victualling *USD 1,500.00 per month/pro rata for cables, entertainment and USD 5.00 per meal. Supercargo and Charterers will sign a Letter of Indemnity prior to his boarding in the usual PANDI wording.*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *always carbon copy to Owners' office fax number: +902166511677 for the smooth operations,* and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs *abstracts on Owners' form,* showing the course of the vessel and distance run and the con-
89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the *natural* ventilation of the cargo *as far as vessel's structure and equipment permit and pursuant to Charterers' instructions.*

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ..............................................
92 ..................................................................................................................................................................................................
93 ~~on giving written notice thereof to the Owners or their Agents~~ ............days previous to the expiration of the first-named term, or any declared option.

94 14. That if required by Charterers, time not to commence before *0001 hours April 15, 2006,*............................................... and should vessel
95 not *be delivered by* ~~have given written notice of readiness on or before~~ *2400 hours April 28, 2006,*............................... ~~but not later than 4 p.m.~~ Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97 15. That in the event of the loss of time from deficiency of *Owners'* men or stores, fire, breakdown or damages to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other *such* cause
99 preventing the full working of the vessel, *unless same caused by Charterers or their servants,* the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra *proven* expenses shall be deducted from the hire.

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London, arbitration according to English Law,* ~~New York~~,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *cognizant in shipping matters.*
*See Clause 61. Arbitration to be subject to English Law, arbitration as per Arbitration Acts 1959/1979 and any amendments thereto. This Charter Party and any disputes arising hereunder shall be governed by and construed in accordance with English Law both as regards substance and procedure.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires/demurrage and deadfreight* for any amounts due under this Charter *whether the Bill(s) of Lading marked "Freight Prepaid" or in any form,* including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules 1974 *and later amendments in London,* ~~at such port or place in the United States as may be selected by the carrier,~~ and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of *London.* ~~New York. In such adjustment disbursements in foreign currency shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126     ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices~~,
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ *Hire not to contribute to General Average.*
132     Provisions as to General Average in accordance with the ~~above~~ *New Jason Clause* are to be included in all bills of lading issued hereunder.
133     20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity~~, and the
134 cost of replacing same, to be allowed by Owners.
135     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *No dry docking except in case of emergency.*................................................................................................................................
139 ................................................................................................................................................................................................................
140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all ~~derricks~~ *cranes*) capable of handling lifts up to ~~three tons~~ *vessel's capacity as per description*, also
141 providing ropes, falls, slings *as on board* and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel ~~lanterns and oil~~ *lights as on board* for
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel.
145     23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers.~~ *Qualified shore cranemen to be employed and paid for by Charterers and acting as their servants. The crew is not allowed to drive the vessel's cranes.* ~~In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~
151     24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155                     ~~U.S.A. Clause Paramount~~
156     ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160                     ~~Both-to-Blame Collision Clause~~
161     ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~of liability represents loss of, or damage to, or any claim whatsoever to the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier~~.
167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to force ice or follow ice breakers.*
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots,* insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of ~~2 1/2~~ *1.25* per cent is payable by the Vessel and Owners to *BBT Tradeships LLC, plus 1.25% to Simpson, Spence and Young (Canada)*
173 ........................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2 1/2 per cent payable to *Charterers*.............................................................on the hire earned and paid under this Charter.

*Rider Clause Nos. 29 to 78, both inclusive, as well as New Jason Clause, Both-to-Blame Collision Clause, PANDI Bunker Deviation Clause 1948, USA Clause Paramount, BIMCO Standard War Risks Clause (CONWARTIME 1993) and General Clause Paramount to be fully incorporated in this Charter Party.*

**CHARTERERS:**                                                                                         **OWNERS:**

                                                                                                        *[signature]*
                                                                                                        **DEVAL**
                                                                                                        DENIZCILIK ve TICARET
                                                                                                        ANONIM SIRKETI

**A/C Repinter International Shipping Co.**
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

29. The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners. In any case the Charterers ultimately responsible from the consequences/performance, etc., of all sub-Charterers.

30. Vessel to be delivered with about 500 MT IFO 180 CST and about 33 MT MDO bunkers. Vessel to be redelivered with about same quantities as actually on board upon delivery.

    Charterers to take over and pay with estimated bunkers on delivery with first hire and Charterers to have the right to deduct estimated bunker value on redelivery from last sufficient hire payment.

    Prices same both ends: USD 350.00/630.00 per metric ton IFO/MDO.

31. **On-/Off-Hire Surveys**
    Joint on-hire survey to be carried out at first load port and joint off-hire survey at last discharge port. Each party to appoint and pay for their own surveyor. Master/Chief Engineer is authorized to attend on Owners' behalf. On-hire and off-hire surveys to be conducted without interruption to vessel's operations, therefore there will be no deduction and/or addition to on-hire time.

32. **BIMCO Standard Stevedore Damage Clause**
    Should any damage be caused to the vessel or her fittings by the stevedores, the Master shall notify same in writing to the responsible stevedores with copy to the Charterers and their agents at time of occurrence of the damage but latest within 48 hours of occurrence.

    The Master shall use his best efforts to have the damage repaired or made good by the stevedores without delay and endeavor to obtain from the stevedores a written acknowledgement specifying the extent of the damage, unless the damage has been repaired or made good in the meantime.

    If the stevedores refuse to repair and settle or acknowledge the damage as aforesaid, the Master shall immediately request stevedores to attend a joint survey of the damage and advise Charterers and their agents accordingly about the result of the survey. If stevedores refuse to attend the survey then Master has to arrange the survey for Charterers' account by an independent surveyor.

    Charterers to be responsible for damage (wear and tear excepted) caused by negligence of stevedores only if not repaired or made good by stevedores and provided Master has complied with instructions as aforesaid.

    In case of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of damage(s) at their expense and the vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.

    The Charterers have the option of redelivering the vessel without repairing stevedore damage not affecting seaworthiness or trading capabilities. The Owners agree that damage not affecting seaworthiness or efficiency and trading capabilities may remain for occasional repair when the ship is to be docked for Owners' account so that Charterers to pay the actual cost of

1

A/C Repinter International Shipping Co.

**Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006**

Clause 32 *continued*
repair for stevedore damage but not for the time used, unless it exceeds the time for Owners' drydocking.

33. Annual war risk insurance premium on vessel to be for Owners' account but any additional premium levied on account of vessel's trading under this Charter Party to be for Charterers' account. Any war bonus to crew and/or Officers to be for Charterers' account. For insurance purposes, the hull and machinery value of the vessel is fixed at USD 9 Million for the duration of this Charter Party. Any extra insurance on cargo due to vessel's age, flag and/or nature of cargo to be for Charterers' account.

34. Should the vessel put back whilst on voyage by reason of any accident or breakdown or in the event of loss of time either in port or at sea, or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel (other than the Supercargo employed by Charterers), or by any refusal of the Master or crew to perform their duties, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient (off hire to the extent Charterers' operations are hindered/actual time lost), in the same position equidistant and voyage resumed there from, and all bunker consumed during period of suspended hire shall be for Owners' account.

35. If vessel calls at any United States port for purposes of loading or discharging cargo, vessel's cargo gear and all other equipment shall comply with regulations established by U.S. Public Law 85-742, June 1966, (Safety and Health Regulations for Longshoring). If longshoremen are not permitted to work due to failure of the Master and/or Owners and/or Owners' agents to comply with the aforementioned regulations, any delay resulting there from shall be for Owners' account (New Safety and Health Regulations, June 1966).

36. It is understood that if necessary the vessel will comply with any safety regulations and/or requirements in effect at ports of loading and/or discharging but always in accordance with ISM and ISPS requirements.

37. Deleted.

38. Owners' PANDI Club: Thomas Miller PANDI Bermuda.
H + M Value: USD 9 Million.

Charterers' insurance company: Charterers Mutual Assurance Assn., London.

39. All cargo claims to be settled in accordance with NYPE Interclub Agreement, as amended 1996 and any later amendments.
The party having paid the claim pursuant to having obtained the other party's prior approval if it is involved shall submit to the other party supporting documents as soon as possible.

It is warranted that during the currency of this Charter Party the vessel will be provided with a Certificate of Financial Responsibility (Oil Pollution) issued by the Federal Maritime Commission pursuant to Public Law 91-224 of the United States of America.

40. Vessel to have on board deratization certificate, also valid cargo gear certificate. These certificates to be maintained throughout the Time Charter period.

2

**A/C Repinter International Shipping Co.**

**Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006**

41. Watchmen for cargo to be for Charterers' account, for ship, Owners' account, but tallymen/watchmen/guard expenses, if compulsory by port authorities, same to be for Charterers' account. Charterers undertake to keep Owners informed during the Charter Party period as regards itinerary of vessel and name of agents at ports of call.

42. Charterers to give 15/10/7/5/4/3/2/1 days approximate notice and redelivery port to be declared together with 15 days notice.

43. Owners will settle their own disbursements at the various ports of call either in cash through the Master or by remittance directly to the agent without any intervention on the part of the Charterers and with Charterers not being permitted to deduct any money from hire in this respect.

44. Any delays encountered as a result of Owners not complying with this Clause to be for Owners' account. Charterers to cooperate in advancing funds on Owners' account in case of unforeseen expenses arising where time will not allow funds from Owners to reach agents before vessel's sailing.

45. Minor Owners' matters to be handled by Charterers' agents free of charge to the Owners.

46. Owners to arrange for any cash to Master and related items themselves.

47. Vessel's main engine uses MDO in/out ports with pilot and while maneuvering in narrow and restricted waters, also in canals, straits, rivers, etc., and with foggy weather.

48. For calculating hire, GMT time to apply both ends.

49. The Bill(s) of Lading to be signed by the Master. In case of demand by the Charterers, Master/Owners to authorize in writing Charterers for issuance and signing the Bill(s) of Lading in strict accordance with Mate's receipts.

50. Owners to permit discharging operations to commence without original Bill(s) of Lading of discharging port(s). Charterers to provide Owners' PANDI Club wording Letter of Indemnity, on Charterers' letterhead signed by an Officer of the company whose signature is binding on the company, in order to discharge without original Bill(s) of Lading being present at discharging port(s) but Charterers to indemnify Owners and hold Owners harmless against any consequences howsoever arising there from.

51. Cargo to be discharged into customs custody and cargo not to be released until original Bill(s) of Lading have been presented provided this is the custom of the port, otherwise cargo to be discharged directly to the Receivers should this be the custom of the port, in which case the Letter of Indemnity to be drawn accordingly.

52. Charterers to fax Letter of Indemnity immediately to Owners for approval, which to be issued fully in strict accordance with relevant Bill(s) of Lading.

53. In the event of breakdown of a winch/crane or for any period of disablement or insufficient power, unless caused by the neglecting attitude of the crane driver, the hire to be reduced pro rata for the period of such insufficiency but only to the extent that time is actually lost to the Charterers in relation to the number of winches/cranes available and the number of respective

3

A/C Repinter International Shipping Co.
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

*Clause 49 continued*

holds to be worked (i.e., if there are only 2 holds to be worked and the gear at each old has been disabled the vessel to be totally off hire. Furthermore, if the vessel is to work 3 holds and 2 of the 3 holds have disabled gear then vessel to be off hire by a factor of 66%).

In the event shore gear is hired at Owners' expense for all holds to be worked then the vessel is to remain fully on hire or pro rata to/for the number of shore cranes hired to the number of holds which are supposed to be worked provided shore gear hired is of the same capacity and speed as vessel's gear, if not then hire to run pro rata.

50. **BIMCO Double Banking Clause**

a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods ~~to~~ for repairs as a result of such operation.

51. **BIMCO ISM Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "THE COMPANY" (as defined by ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for the Owners' account.

52. *Hire*
Hire to be paid to Owners' bank:

Deval Denizcilik VE TIC.A.S.
C/O Garanti Bankasi Altunizade Branch, Istanbul

4

**A/C Repinter International Shipping Co.**
**Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006**

*Clause 52 continued*
Account No.: 9004781/USD E
SWIFT CD: TGBATRIS 914

53. *Vessel's Description*          All Details "About"
M/V "Orhan Deval"
Turkish Flag - Built: Nov. 1984 – Self Trimmer Bulk Carrier
Call Sign: TCPX
GRT / NRT: 16,605 / 9,208
Summer DWT: 27,562 on 9.765 M draft
PANDI: UK (Bermuda)
Class: ABS
LOA / Beam / Depth M.: 168.30 / 26.00 / 13.63 M
Winches: 4 x 25 MT Cranes
Steel-floored - folding type   steel hatch covers
2 x 10 CBM Mechanic Grabs
Log fitted
All Aft Holds / Hatches: 5 / 5
Dimensions:

| Hold No. | Length  | Grain     | Bale      | Hatch Sizes       |
|----------|---------|-----------|-----------|-------------------|
| 1        | 18.10 M | 151,060   | 140,578   | 9.48 x 13.32 M    |
| 2        | 26.00 M | 271,138   | 262,090   | 18.96 x 13.32 M   |
| 3        | 26.00 M | 272,416   | 262,744   | 18.96 x 13.32 M   |
| 4        | 26.00 M | 272,953   | 263,584   | 18.96 x 13.32 M   |
| 5        | 26.00 M | 256,645   | 251,150   | 18.96 x 13.32 M   |
| Total Grain/Bale |  | 1,224,212 | 1,180,146 CBFT |        |

Last Dry Dock / Next: Dec. 2005 / January 2008

|          | Length (M)   | FRW (M) | Aft (M) |
|----------|--------------|---------|---------|
| No. 1    | About 19.00  | 4.50    | 18.00   |
| No. 2    | About 26.00  | 18.00   | 18.00   |
| No. 3    | About 26.00  | 18.00   | 18.00   |
| No. 4    | About 26.00  | 18.00   | 18.00   |
| No. 5    | About 26.00  | 18.00   | 9.40    |

Tank Top
HO. No. 1  17.8 MT per SQM
HO. No. 2  10.8 MT per SQM
HO. No. 3  20.4 MT per SQM
HO. No. 4  10.8 MT per SQM
HO. No. 5  14.4 MT per SQM

Economical speeds and consumption: About 11 knots/about 18 MT/day.

Speed/Consumption
At about 12.5 knots about 21 MT IFO 180 CST and about 0.2 MT G/O at sea.
About 2.5 MT IFO and about 0.2 MT G/O at port – about 1.2 MT IFO daily.

5

A/C Repinter International Shipping Co.
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

54. New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 1993 Clauses, P & I Bunkering Clause, General Average per latest amendments, USA Clause Paramount or General Clause Paramount where applicable, are deemed fully incorporated in this Charter Party and to be included in all Bill(s) of Lading issued, including Lien and Arbitration Clause.

55. Trade and/or fixture to be kept absolutely private and confidential.

56. If steels (for billets not really necessary but we have mentioned remarks anyway) or other sensitive cargoes are loaded, Owners to arrange for a pre-shipment survey, tally and out-turn report of such cargoes to be held by Owners' PANDI Club's representatives. Cost of such survey to be paid by the Charterers against relevant invoice of PANDI surveyor.

For steel cargoes Owners' PANDI remarks must be specific and cargo related, no remarks such as broken/missing/loose bands/straps to qualify as a remark which must be inserted in the Mate's Receipt and/or Bill(s) of Lading.  All Bill(s) of Lading to be stamped "Clean on Board" plus any remarks in accordance with Mate's Receipts.  PANDI remarks to be specific and the individual coil, bundle, etc., must be identified and marked by the PANDI so that at the discharge port such piece can be easily identified.

Acceptable remarks as follows:

- Hot Rolled Coils - Covers dented.
- Galvanized/Cold Rolled Coils - Covers dented.
- Steel Billets - Atmospheric rust, some pieces slightly bent.
- Steel Rebars - Atmospheric rust, slightly bent, wet before shipment, loaded from open area.
- Wire Rod - Atmospheric rust, wet before shipment, loaded from open area.
- Steel Plates/Sheets - Atmospheric rust, wet before shipment, loaded from open area.
- Steel Angles/Channels/Merchant Bars - No remarks
- Steel Pipes - No remarks.

57. Any cargo that does not meet the above approved remarks should not be loaded until Charterers or their representatives have had time to inspect the cargo and decide whether or not to permit the loading of same. If approved for loading by Charterers, a separate Bill of Lading and Mate's Receipt to be issued for such pieces with all the necessary remarks inserted on same and the Master can not be held responsible for time lost in this respect.

58. Charterers have the option to redeliver the vessel to Owners in an unclean condition, paying Owners USD 3,700.00 lumpsum excluding dunnage removal. Charterers to remove dunnage / lashing / mats prior to redelivery. If vessel is redelivered in United States of America/Canada, removal/disposal of dunnage at Charterers' time/risk/expense.

59. Owners/Master to keep Charterers regularly informed of vessel's expected delivery.

60. Deleted.

61. Deleted.

62. Deleted.

63. In cases where neither the claim nor the counter-claim exceeds the sum of USD 75,000.00 the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

6

*A/C Repinter International Shipping Co.*

*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

62. It is expressly agreed that the Charterers will not issue or cause to be issued Bill(s) of Lading which are subject to the provisions of the Hamburg Rules.

63. Charterers to pay all local, state, national taxes and/or dues assessed on the vessel or Owners resulting from Charterers' orders herein, whether assessed during or after the currency of this Charter Party, including any taxes and/or dues on cargo and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the vessel or Owners).

64. No liner or through Bill(s) of Lading to be issued.

65. **Trading Exclusions**
The vessel to be trading worldwide via safe port(s), safe anchorage(s) and safe berth(s) always afloat excluding Cuba, Angola including Cabinda, North Korea, Cambodia, Ethiopia, Eritrea, Hudson Bay, Somalia, Serbia and Montenegro, Zaire, Sri Lanka, Russian North Pacific CIS ports, Yemen, Kuwait, Syria, Lebanon, Libya, Albania, Greek zone of Cyprus, Iraq, Iran and all countries/areas where United Nations imposes trade sanctions from time to time and all countries where war or warlike situations exist. No direct trading between China and Taiwan.

Charterers' option to breach Institute Warranty Limits but always against Owners' agreement/ confirmation and reimbursement of extra insurance according to the London underwriters. Iraq and Cuba to be allowed if cargo is United Nations-approved cargo subject to Owners' final confirmation and agreement with the Charterers.

The Owners agree to call Cuba with USA aid and USA-approved cargos.

66. **Cargo Exclusions**
The vessel shall be employed in carrying lawful merchandise in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment/ discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Charterers warrant that all cargoes to be loaded/stowed/carried and discharged in strict conformity with IMO and local regulations and BC Code. Any extra fittings/equipment/etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense. Charterers will hold Owners harmless against all and any consequences that may arise and will indemnify Owners for all and any damages and or losses owners may suffer as a result of any failure in this respect.

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this Charter:

It is understood that vessel is not employed in the carriage of:

Asphalt, arms, ammunitions, ammonium nitrate (but harmless fertilizer grade allowed), acids, asbestos, black powder, bones, copra and/or its products, concentrates especially calcium carbide and hypochlorite, creosoted goods, cement (clinkers ok), caustic soda, detonator caps, direct reduced iron/iron ore briquettes, pond coal, fishmeal, ferrosilicone, hides, livestock, manioc and/or manioc pellets, naphtha, nuclear and radioactive materials/products and/or waste, niger seed, oil cakes, pitch, petroleum and/or petroleum and its products (petcoke ok), pyrites, sunflower seed expellers and pellets, linseed expellers and pellets,

7

*A/C Repinter International Shipping Co.*
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

*Clause 66 continued*

seed cake, salt, sulphur, scrap of all kinds, sponge iron/pre-reduced iron ore pellets, silicone, manganese, tar and/or its products, turpentine, inflammable, dangerous and hazardous goods and any other cargoes for which $CO_2$ fitted tonnage is required as per IMO recommendations and other than vessel's natural ventilation is recommended or required, provided all cargoes to be in strict conformity with vessel's Certificate for Carriage of Solid Bulk Cargoes.

Two (2) cargoes each sulphur, salt, log, scrap (no turnings/no motor blocks/non-oily municipality scrap) can be loaded for this Charter period. If sulphur and salt will be loaded, the vessel to be fully lime washed and lime washing to be removed by the Charterers in their time and expenses under Master's satisfaction.

Owners agree for the loading of bulk copper/zinc/lead concentrates as per IMO regulation.

*Soft Loading Clause:*
Stevedores to initially lower the cargo on tank tops of each hold slowly to create a safe cushion of all cargoes prior to dropping cargo in holds.

1. Concentrates always provided that carried in accordance with the terms of the Charter Party and to be in full conformity with and to be loaded/carried/stowed/discharged in accordance with IMO and/or local authorities regulations/recommendations and certificate of water contents to be within safety margin for water transport as ascertained by IMO Code. Charterers are fully responsible for all time/cost/expenses pertaining to the carriage of concentrates including but not limited to certification/surveys required for carriage of this cargo.

2. HMS 1+2 or shredded scrap, non-oily and always excluding MBT. Charterers to observe Soft Loading Clause whereby first layers of scrap to be gently lowered and loaded on vessel's tank top forming a cushion prior balance cargo loaded to Master's satisfaction. When scrap loaded, the first load/layer of scrap in each hold to be lowered as/low/close as possible to bottom of the hold to provide a proper flooring and cushion for loading balance cargo to Master's satisfaction.

3. Petcoke to be loaded at Charterers' risk and expense and any special requirements and or fittings as per IMO regulations as well as local and international regulations to be attended by Charterers at their risk and expense prior to loading. Any cleaning including supply of detergents as required to be entirely at Charterers' time, risk and expense.
Petcoke not to be last cargo prior redelivery.

Cargoes that allowed herein but it is required or it is recommended to limewash cargo holds prior to their loading, Charterers to arrange and pay for a suitable lime coating, if required by Master/ Owners to Master's satisfaction and likewise arrange and pay for removal of same after discharge to Master's satisfaction or in the event of a dispute, as per PANDI surveyors' recommendations.

During the currency of this Charter Party Charterers are allowed to load max two cargoes of the following:
(a) Logs
(b) Scrap

8

A/C Repinter International Shipping Co.
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

**Clause 66 continued**
(c) Sulphur
(d) Salt

Granite blocks can be loaded provided sufficiently dunnaged to Master's satisfaction or in the event of a dispute, as per PANDI surveyors' recommendations.

Ferts Grade amnitrate (UN No. 2067 ok) and Ferts Grade amsulfate are allowed in (classified under Appendix A or C of the BC Code).

Owners not to be responsible for any contamination and/or damage to cargo which may arise due to mixed cargo loaded in the same hold even if separation has been erected in the hold.

67. **BIMCO ISPS/MTSA Clause for Time Charter Parties 2005**

a) i) The Owners shall comply with the requirements of the International Code for the Security of Ships and Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

b) i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".*

ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

c) Notwithstanding anything else contained in this Charter Party, all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely



9

A/C Repinter International Shipping Co.
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

*Clause 67 continued*

from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

68. *US Customs Advance Notification / AMS Clause for Time Charter Parties*
(a.) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

   i) Have in place a SCAC (Standard Carrier Alpha Code);
   ii) Have in place an ICB (International Carrier Bond);
   iii) Provide the Owners with a timely confirmation of I) and ii) above; and
   iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

69. *Intermediate Holds Cleaning*
Any intermediate hold cleaning(s) if required by Charterers shall, in Charterers' option, be performed by either the vessel's crew or by shore labor at Charterers' time/expense. If Charterers request services of crew for intermediate cleaning then this cleaning to be performed whilst vessel is en route to next loading port, provided the time of ballast leg is sufficient for the work and the weather suitable, or in port provided shore regulations permit. If this option is declared then Charterers are to pay Owners USD 700.00 per hold for each occasion. All intermediate cleaning, even if effected by crew, (crew acting as Charterers' servants) and should vessel's holds be subsequently rejected and any further cleaning, etc., be required, then these expenses and time used always to be for Charterers' account. Any special equipment and / or materials/ chemicals, etc., which may be required for hold cleaning are always to be provided and paid for by Charterers.

70. *BIMCO Fuel Sulphur Content Clause for Time Charter Parties*
Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the vessel is trading within

10

**A/C Repinter International Shipping Co.**
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

*Clause 70 continued*

that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the United States Environmental Protection Agency.

71. **Fumigation**
Charterers have the liberty to fumigate the cargo on board at loading and discharging port(s) or places en route at their risk and expense as per IMO and local regulations. If, due to fumigation, Officers/crew must be accommodated ashore then hotel expenses including victualling and transportation to be for Charterers' account.

72. **Shortage Clause**
Charterers undertake to appoint and pay for draft surveys at load and discharge ports. To the extent Charterers fail to do so then the Master will be deemed to have been authorized to perform these surveys on behalf of the Charterers.

73. **Safe Stowage and Trimming**
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expenses.

74. Owners have the option during the period of the Time Charter to be allowed to sell the vessel on the understanding that any sale will be with this Charter to be performed by the new Owners and under this Charter Party terms agreed. Charterers' prior approval of buyers should be obtained on the understanding that this is not to be unreasonably withheld.

75. In case of multi port/multi Receivers then Owners not to be responsible for the distribution of cargo splits between ports/Receivers but for the aggregate cargo discharged. The Master will follow Charterers' orders as best possible for correct cargo distribution.

76. Any cargo separations required, other than natural separations, shall be for Charterers' account/time/responsibility. Owners not to be responsible for any mixture and/or contamination of the cargo.

77. No welding of padeyes, etc., in places which adversely affect vessel's epoxy coated wing tanks or double-bottoms of fuel oil/diesel oil tanks.

78. Deleted.



DEVAL
DENIZCILIK ve TICARET
ANONIM SIRKETI

11

*A/C Repinter International Shipping Co.*
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*



### New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### Both-to-Blame Collision Clause

If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect, or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

### P & I Bunker Deviation Clause 1948

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners, even to the full capacity of fuel tanks, deep tanks, and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

### U.S.A. Clause Paramount

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill Of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

12

A/C Repinter International Shipping Co.

Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006

BIMCO Standard War Risks Clause for Time Charters, 1993 Code Name: "CONWARTIME 1993"

1.) For the purpose of this Clause, the words:

a) "Owner" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other Operators who are charged with the management of the vessel, and the Master and

b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels or certain flags or ownership, or against certain cargoes or crew or otherwise howsoever), by any person, body, terrorist, or political group, or in the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners may be dangerous or are likely to be or to become dangerous to the vessel, her cargo crew or other persons on board the vessel.

2.) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through any port, place, area or zone (whether of land or sea), or any waterway or canal where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners may be or are likely to be exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessel of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject, to a belligerent's right of search and/or confiscation.

4.) A) The Owners may effect war risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including but not limited to loss or earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

B) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within or is due to enter and remain within any area or areas which are specified by such Underwriters as being subject to additional premiums because of War risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:
a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports, of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the

13

*A/C Repinter International Shipping Co.*
*Rider to M/V "Orhan Deval" Time Charter dated April 13, 2006*

vessel sails, or other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and within national law aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

d) to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscate as a contraband carrier;

e) to divert and call at any other port to change the crew or any part thereof or other persons onboard the vessel when there is reason to believe that they may be subject to interment, imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing provision of this Clause the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-Clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation but shall be considered a due fulfillment of this Charter Party.

General Clause Paramount
This Bill of Lading shall have effect subject to the provisions of any legislation relating to the Carriage of Goods by Sea which incorporates the Rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August, 1924, and which is compulsorily applicable to the Contract of Carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities hereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from or limitation of liability.

14