UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEVAL DENIZCILIK VE TICARET A.S.,

Plaintiff,

- against -

REPINTER INTERNATIONAL SHIPPING CO.
S.A. and MIACHART CORPORATION LLC,

Defendants.

07 CIV 3397 (JGK)

---

**EPAMINONDAS G. ARGHYRAKIS** pursuant to 28 U.S.C. §1746 hereby declares and says the following under penalty of perjury:

1. I am a Solicitor of the Supreme Court of England and Wales and a partner in the firm of E.G. Arghyrakis & Co. of 150 Fleet Street, London EC3A 2DQ.

2. I act for and am authorised by the Plaintiffs in this action, Deval Denizcilik ve Ticaret AS (Deval Shipping & Trading) ("the Owners") to make this declaration in opposition to the motion of the Defendants Repinter International Shipping Co. S.A. and Miachart Corporation LLC which seeks an Order directing the Plaintiff Deval Denizcilik ve Ticaret A.S. to accept a Letter of Undertaking as substitute security to cash funds seized in US Banks by Order of the Honourable Judge John G. Koeltl dated 30th April 2007.

3. Save where otherwise appears the contents of this affidavit are derived from my own knowledge and the information obtained by me from my clients and from the sources stated. They are true to the best of my information and belief.

   **Background**
4. The Plaintiffs in this action are the Owners of the bulk cargo vessel mv *Orhan Deval* ("the Vessel"). The dispute between the parties arises under a charterparty of the Vessel dated 13th April 2006 ("the Charterparty") with Repinter International Shipping Co. S.A. of Guatemala.("Repinter" or "Charterers"). Miachart Corporation LLC of Miami, Florida, USA ("Miachart") guaranteed to the Owners Repinter's performance of the Charterparty.

1

5. The Charterparty is subject to English Law and all disputes arising thereunder are subject to arbitration in London.

6. Despite voluminous documentation to the contrary in the charterparty fixture files between the parties' brokers, Miachart have now denied that they gave the Owners the guarantee mentioned above (or any guarantee).

7. During the course of the charter the Vessel was damaged by stevedores employed either directly or indirectly by the Charterers. The damage was of a severity affecting the Vessel's Class and her trading capability[1]. The Charterparty provides that the Charterers are responsible for the repair of such damage. It appears that the Charterers initially sought to effect repairs of the vessel by persuading their sub-charterers to effect the same. However, when the sub-charterers failed to do so (and terminated the sub-charter) the Charterers gave the Vessel no further orders, abandoning her at a non-contractual redelivery point with insufficient bunkers (Fuel Oil). The Owners therefore resumed control of the Vessel, carried out temporary repairs enabling her to sail to a repair yard and carried out the necessary repairs at the Yard. Full access to the Vessels was afforded to the Charterers' surveyors and Charterers' representatives during the course of the repairs.

8. The Owners claim against the Charterers the loss they have suffered as a consequence of Charterers' breaches of the Charterparty. It is noteworthy that the Charterers have *admitted* substantial portions of the Owners' claim, although they have still not paid these amounts to the Owners.

9. Being thus severely out of pocket and faced with Miachart's refusal to honour their guarantee, the Owners decided to commence proceedings in the US in order to secure their claims, together with interest and costs. My understanding is that certain sums have definitely been caught by the Order of the Honourable Judge John G. Koeltl of 30th April 2007, whereas other funds may have been caught by it. It would appear that Repinter and/or Miachart have now organised their affairs in such a way as to avoid the effect of the Honourable Judge's Order, by either not wiring funds in US Dollars or by sending and receiving funds under the name of a different company or companies affiliated to them, whose identity is not known to the Owners.

10. On 10th May for the first time a Letter of Undertaking was offered by attorneys acting on behalf of Miachart and Repinter (Exhibit 1). Apart from the wording (which was not examined at that time) the LOU indicated that it was being given on behalf of "the Charterers P&I Club". However, investigations revealed that no such entity existed; according to the website of Michael Else & Co. Ltd.

---

[1] All vessels in international trade are required to be "in class" by their Classification Society, an organization which ensures compliance with safety standards, conventions, etc. in order to maintain their insurance and be able to trade. The present Vessel's Classification Society is the American Bureau of Shipping (ABS).

2

(http://www.else.co.uk/charterers/faq.htm) the question "*What is the Charterers' P&I Club?*" is answered as follows:

"*The Charterers P&I Club is the brand name for a charterers liability policy underwritten by certain underwriters at Lloyd's*" (Exhibit 2)

Accordingly I recommended to the Owners not to accept an LOU given on behalf of an entity which appeared to have no legal persona or existence.

11. Thereafter the Charterers' attorneys offered an LOU on behalf of "CR O'Farrell Syndicate 1036". I detail below my investigations into this entity.

12. In summary Owners have requested Charterers to answer three simple questions as to the substitute security they offer:

a) What is the legal entity offering the LOU?

b) How do Owners go about collecting under the LOU in the event they obtain an arbitration award in their favour?

c) What reasonable assurances do Owners have that the entity providing the LOU will have the assets necessary to pay?

Charterers have been either unable or unwilling to provide clear answers.

They initially offered paper security from a "brand" of an insurance product and subsequently, when called on this by Owners, offered that the LOU would be issued by a "Syndicate" which appears no longer to be a syndicate in its own name, but instead operates as a "sub-syndicate" of another syndicate, operated and managed by a third entity (Limit Underwriting Limited) which itself is "part" of a further company "QBE European Operations", which is said to be a "division" of a parent insurance company ("QBE Insurance Group"). Despite having now ostensibly identified the ultimate backer of the LOU as "QBE Corporate Ltd.", another subsidiary of QBE Insurance Group, the Charterers have still not provided clear answers to these questions[2].

**Status of LOU now offered**

13. As Mr. Sunley indicates in paragraph 16 of his affidavit, the wording of the LOU offered by the Defendants (Exhibit 2 of his affidavit of 13th June) has been agreed between the parties in principle. This agreement was the outcome of discussions and exchanges between my colleague at Reed Smith Richards Butler Mr. David Semark, representing Repinter and Miachart in the UK, and myself. As far as the Owners are concerned such agreement is subject to three fundamental conditions,

---

[2] In total there seem to be 13 "QBE" Companies registered in England (Exhibit 11). None of these appear on the letterhead of Mr. Sunley (Exhibit 1 of his affidavit). Only one of them – QBE Insurance (Europe) Ltd. appears on the organization chart of Exhibit 5 of the present declaration.

3

however, these being

(i) Miachart's agreement that it is, after all, a guarantor of Charterers Repinter for all Owners' claims under the charterparty;

(ii) Miachart's agreement to submit to London arbitration in relation to any claims under the aforesaid guarantee; and

(iii) the solidity of the entity who is to be liable under the LOU offered (considered in paragraph 12 above and paragraphs 15 – 34 below).

### Miachart Guarantee and participation in the London arbitration

14. I would respectfully submit that, if Miachart do not concede the points set out in paragraph 13 (i) and (ii) above, then the LOU wording will require very significant amendments. This is because, other than by agreement, Miachart will not be bound by any arbitration clause, since (whether they are guarantors or not) they are not parties to the Charterparty or to any other arbitration agreement. The Owners would therefore be obliged to commence proceedings against them in the US, probably joining also Charterers' brokers BBT Tradeships (if the guarantee continues to be denied by Miachart). By contrast, the draft LOU only answers to claims submitted to arbitration in London.

### Status of entity giving the proposed LOU

### A. Lloyds Syndicate 1036

15. My initial investigations regarding the status of Lloyds Syndicate 1036 revealed that it was in run-off, which I understood to mean that it had ceased any further underwriting although it was still engaged in receiving premiums and paying claims for previous years. This understanding was derived not only from information received by me from Lloyd's brokers[3] but also from my consideration of the 2006 accounts for Syndicate 1036 (Exhibit 3). On p. 3 of this Exhibit it is said

*"Business Review and future developments*
*The 2004 underwriting year represents Syndicate 1036's <u>final year as a separate</u>*
<u>*syndicate*</u> *prior to its merger into umbrella Syndicate 2999 for the 2005*
*underwriting year onwards. It now reports as a sub syndicate within the*
*Syndicate 2999 accounts… "* (emphasis added)

16. The same theme was repeated in the "Annual Report December 2005" for Syndicate 1036 (Exhibit 4) which at p. 23 states, contrasting a "sub-syndicate" with a "stand alone syndicate":

---

[3] The Owners' US attorneys Messrs Freehill, Hogan & Mahar LLP have been authorized to disclose the identity of this broker to the Hon. Judge but not to the Defendants or their attorneys, for fear of potential reprisals.

*"1. BASIS OF PREPARATION OF THE ANNUAL REPORT*
*a) For the 2005 year of account, Syndicate 1036 is <u>a sub-syndicate</u> of umbrella*
*Syndicate 2999. For <u>2004 and prior years, Syndicate 1036 is a stand alone*
*syndicate</u>..."* (emphasis added)

17. As regards "underwriting capacity", I note that while Mr. Sunley has said, in his letter to the Hon Judge Koeltl, that Syndicate 1036 has an underwriting capacity of £220 million, the QBE Corporate Ltd. accounts for 2005 (p. 3 of Exhibit 5 of Mr. Sunley's affidavit of 13th June) state that for the years 2002, 2003 and 2004 the underwriting capacity of Syndicate 1036 was £12.13m, £14.555m and £16.173m respectively. The capacity for 2005 is stated to be nil. Despite my repeated requests Mr. Semark has been unable to explain to me why this is so. There would appear to be a very large leap in any event between these figures and the one Mr. Sunley quotes as the underwriting capacity of Syndicate 1036 for 2007. In my view, the likelihood is that the allocation of capacity for Syndicate 1036 in years after 2004 is merely an internal allocation of capacity by Syndicate 2999 to its sub-syndicate, indicating that 1036 has no separate existence.

18. Further, the 2006 annual accounts of Syndicate 2999 (Exhibit 5) - (the so-callled "umbrella syndicate" under which 1036 is currently said to operate) expressly state on p. 35 how Syndicate 1036 ceased independent business activities at the end of 2004:

    *"Syndicate 1036 <u>ceased writing as a separate syndicate</u> at the end of 2004 when it became a sub-syndicate of Syndicate 2999..."* (emphasis added)

19. Finally, a search of syndicate 1036 on the web site of Lloyds of London reveals that Syndicate 1036 is "closed" (Exhibit 6). The same page also states that it is not in run off. I take this to mean that the run off has been completed, probably as a result of purchasing "reinsurance to close", which I understand effectively transfers the risk of liabilities remaining from open years to the reinsuring entity.

20. This is all quite confusing. In the end, I am unable to say with any certainty what the precise legal status of "Syndicate 1036" is. It is certainly not currently registered as a Lloyd's Syndicate and the Lloyd's directory indicates that it is "closed". It would appear that at this time Syndicate 1036, in reality, has no existence outside its "umbrella syndicate", Syndicate 2999. In management terms 2999 may well be divided into "sub-syndicates" specialising in different kinds of insurance, just like a firm may be divided into separate departments. Syndicate 1036 would therefore be a division of Syndicate 2999 or a trading name of some of the underwriting business of Syndicate 2999, not a separate entity at all[4].

21. When it comes to the question of the acceptance of an LOU, however, what is offered by the Defendants is the exchange of cash seized in US Banks in

---

[4] As such it is also questionable in what capacity it purports to have provided Michael Else & Co. Ltd. with the Power of Attorney appearing as Exhibit 3 of Mr. Sunley's affidavit of 13th June 2007.

exchange for an undertaking signed on behalf of what may well be, in reality, merely a management division and not a legal entity at all. Indeed, this is similar to the Defendants' original offer of an LOU on behalf of a non-existent entity (see paragraph 10 above).

22. In this respect I would also mention the difficulty in eliciting a response from "Syndicate 1036". Exhibit 7 contains copies of my faxes to the Syndicate, all of which have remained unanswered. The one line of communication which did initially receive some response, my e-mail of 31ST May 2007 to Ms Kirstie Coker of "QBE European Operations" (Exhibit 8) also remains unanswered in substance. It should be emphasised that these faxes were transmitted successfully to the number appearing in Mr. Sunley's letterhead, although even now he does not mention receiving them. In this context the Owners are naturally concerned that, if such a routine request is met with such complete silence, their future efforts to enforce an LOU for over US$1 million will meet with much greater difficulty.

**B. QBE Corporate Ltd.**

23. Mr. Semark has informed me that the only "member" of Syndicate 1036 is a limited liability company called QBE Corporate Ltd. ("QBECL"), the latest accounts of which (to 31st December 2005) appear as Exhibit 5 of Mr. Sunley's affidavit of 13th June. In fact, it would appear that this company is the only member of Syndicate 2999 itself, since it provides 100% of the capital of this syndicate including its "sub-syndicates" (as appears from paragraph 15 of Mr. Sunley's affidavit).

24. It is surprising to note that the "called up, allotted and fully paid" share capital of QBECL is only £2 (paragraph 13 of p. 16 of Exhibit 5 of Mr. Sunley's affidavit). It appears that the funds available to this company have been provided by its ultimate parent company QBE Insurance Group Ltd. (incorporated in Australia). p. 18 of the same exhibit (paragraph 19 of this page) states that QBECL's "funds at Lloyds" have been provided by financial instruments such letters of credit, pledges and guarantees given by third parties: QBE Insurance Group Ltd, ABC Securities and Limit plc. Further p. 10 of the accounts of QBECL (paragraph 1(a)) states

    "...
    *The financial statements have been prepared on a going concern basis as the Company's ultimate parent undertaking, QBE Insurance Group Limited, has indicated that it intends to provide such funds as are necessary for the Company to continue to trade for the foreseeable future.* "

I would note that the Owners have of course received no such "indication" from the parent company of QBECL, let alone any more concrete assurance that such support will continue.

6

25. In paragraph 40 of his affidavit Mr. Sunley sets out some highlights of the assets of QBECL suggesting that these prove its solvency. However, a company's assets alone prove nothing, if its liabilities are not also taken into account.

26. Pages 8 and 9 of the accounts of QBECL (Exhibit 5 of Mr. Sunley's affidavit) set out the assets and liabilities of this company. On p. 8 it is said that the total assets amount to £1,858.421m (including the figures Mr. Sunley sets out). The total figure for the liabilities on p. 9 is the same, but in order to reach this balancing figure it is necessary to include an *accumulated deficit* (i.e. an accumulated trading loss) of £32.474m. This figure is made up from the current year's trading loss of £8.34m appearing on p. 7, added to the previous year's accumulated loss of £24.134m (second column of p. 9).

27. QBECL is therefore a loss-making concern. Moreover it is insolvent, as its total assets (£1,858,421m) exceed its total liabilities (£1,858,421m + £32.474m = £1,890.895m).

28. Quite irrespective of the above my investigations have revealed that QBECL has no fewer than 89 current undischarged "company charges" registered against its assets (Exhibit 9). I am informed that such charges are in some respects similar to registered liens and judgments under US Law. In accordance with English Company Law, priority over a company's assets is usually determined by the date of registration of each charge, so that a prior charge would have priority over a later one. In this respect I am uncertain whether an LOU issued on behalf of a "sub-syndicate" of which QBECL is a member would even be capable of registration as a charge against the assets of QBECL itself. Even if it would, however, it would rank in priority below these 89 charges. Further it is impossible to calculate the total amount due under these charges as they are all for variable sums.

**C. The three levels of security offered by Lloyds**

29. In paragraphs 27 to 39 of his affidavit Mr. Sunley suggests that an LOU issued on behalf of Syndicate 1036 would afford the Owners the 3-tiered level of security available at Lloyds. In my view this is wrong.

30. Exhibit 10 shows a Lloyd's publication on the "chain of security" at Lloyds. This explains the three levels and I would comment as follows:

*Syndicate Level Assets*
As the publication makes clear, these funds must be utilised

*"...to meet all claims and all necessary and reasonable expenses and outgoings in connection with the syndicate business."*

and

7

*"Other than paying claims, premium trust funds can be used only to meet permitted expenses and outgoings, for example, reinsurance premiums and underwriting expenses."*

Quite clearly, in my view, these funds are held in trust to discharge insurance claims in favour of the assured; not claims arising out of extraneous activities such as the giving of LOUs.

*Members' funds at Lloyds*
Again quoting the publication, these funds

*"are held in trust as security for the protection of policyholders and other insurance business creditors of the member"*

These funds would not therefore be available to the Owners because they are neither "policyholders" nor "other insurance business creditors".

*Central Assets*
Apart from the fact that payment of these funds is at the discretion of the Council of Lloyd's, the use of these funds is said to be

*"generally restricted to underwriting liabilities in respect of non-life business...and of life business..."*

Once again, since the Owners would not be in the position of policyholders, it would not be possible for them to benefit from this level of security either.

31. I have therefore been unable to verify whether LOUs issued by Lloyds Syndicates benefit from these levels of security, as Mr. Sunley states in paragraph 30 of his affidavit. The above extracts would indicate that they do not. I would also point out that there is doubt as to whether Syndicate 1036 (in its present existence) can in any event be properly described as a Lloyd's Syndicate. Moreover, at the very least an investigation on whether such security would apply to the Owners, if they accepted the LOU offered, would entail a lengthy and detailed analysis of Lloyd's regulations. The Owners should not have to perform such analysis.

**D. QBECL's ultimate holding company**
32. I have noted that QBECL appears to be backed by an Australian company which (it is indicated) is very substantial, QBE Insurance Group Limited. Whilst this may be correct it does not afford any comfort to Owners, whose line of recourse stops with QBECL. The fact that the parent company has provided funds to support QBECL is no guarantee that the parent will place the subsidiary (QBECL) in funds in order to pay when the LOU comes to be called upon by Owners.

33. In any event, the Owners' suggestion to consider an LOU from the parent company has been rejected by Charterers. I have therefore not carried out any

8

investigations of the parent.

34. It would appear that QBECL is one of a considerable number of subsidiaries and affiliated or associated companies of QBE Insurance Group Ltd. (Exhibit 11). It is odd, however, that the organisation chart appearing as the second page of the annual report of Syndicate 2999 (Exhibit 5) does not contain any mention of QBECL at all.

**Counter-security**

35. It is correct that the Owners have sought to obtain agreement from the Charterers that no counter-security should be demanded. Owners will address the merits of this at the proper time, in accordance with the schedule agreed between the parties and approved by the Court. At the moment, however, I would mention that the Owners have also sought to obtain Charterers' agreement that

(i) Charterers should only seek counter-security in the US, and

(ii) Charterers should accept a corporate LOU from the Owners.

Both these requests have been rejected; so that whilst the Charterers demand that the Owners should accept an LOU from a company with a share capital of £2 which is insolvent, they refuse to consider, in their favour, an LOU from a shipping company which owns some 9 vessels in its name, worth tens of millions of dollars.

**Conclusion**

36. It has been suggested by the Charterers' attorneys that the Owners are being deliberately obstructive. This is unjustified and unfair. The Owners are only seeking proper security for substantial claims which they have against the Charterers, a large proportion of which has been admitted. Having initially been induced to conclude the charterparty contract by the promise of a guarantee from Miachart, they have been told that Miachart repudiates any such liability. Then they were offered an LOU from an entity which does not exist. Now they are offered security in the form of an LOU signed on behalf of a "sub-syndicate", with the suggestion that they should be satisfied by explanations dependent on an accurate evaluation of an complicated corporate set-up and an interpretation of the convoluted and obscure structure of Lloyd's. They are understandably unwilling to accept this. The Owners have no interest in prolonging the costly litigation in the US instead of progressing the arbitration in London.

37. I would submit that the strength of any substitute security offered by the Defendants as a replacement of the cash seized by the Honourable Court in the US should be capable of plain and simple investigation. Clearly, this is not the case here. The Owners remain willing to consider any reasonable alternative security offered.

9

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England
        18th June 2007

_____
**EPAMINONDAS G. ARGHYRAKIS**

10