## PRELIMINARY STATEMENT

This Reply Memorandum of Law is respectfully submitted on behalf of Defendants/Counterclaimants, Repinter International Shipping Co., S.A. and Miachart Corporation LLC ("Repinter/Miachart" or "Charterers") in further support of the first aspect of Defendants' (bifurcated) motion to vacate the April 30, 2007 Order of Attachment and for countersecurity pursuant to Rule E (4)(f) and Rule E (7), respectively, of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

## REPLY TO PLAINTIFF'S BACKGROUND FACTS

In addition to the claims of Plaintiff Deval Denizcilik Ve Ticaret A.S. ("Deval" or "Owners"), the London arbitration will be addressing the counterclaims of Defendants, Repinter/Miachart against Plaintiff. Defendants' counterclaims arise out of, inter alia, the loss of hire withheld and/or not paid to Defendants by the subcharterer, Belrussian Shipping Co. ("BSC"), and the claims asserted by BSC against the Defendants for which the Plaintiff ultimately may be held liable in the London proceeding. From the issuance of the April 30, 2007 Order of Attachment to date, Defendants have restrained approximately USD658,000.[1] See Exhibit A to the June 21, 2007 Reply Declaration of Mary Ann C. Marlowe. ("Marlowe Reply Decl.")

Plaintiff rejected the initial LOU tendered by The Charterers P&I Club on/about May 10, 2007 based upon the "determination" by Plaintiff's counsel that the Club

---

[1] Plaintiff's statement that " Deval has succeeded in restraining approximately $435,000 of Defendants' property" reflects the amount restrained as of May 31, 2007 at which time an additional $223,000 was restrained.

allegedly is not "a valid legal entity."  Plaintiff's Memorandum of Law in Opposition to

Defendants' Motion to Vacate  (Pltf's Mem.in Opp.) at 1.  However, as stated at

paragraphs 23 – 24 of the June 13, 2007 Affidavit of Myles A. Sunley, the Charterers

P&I Club was originally started as a Mutual Assurance Association in 1986. In 1999 the

members decided to reorganize the Club and run it in its present form as a fixed premium

insurance with 100% Lloyds backing.  The Club was originally and is still operated by

Michael Else as the underwriting agents.  It had then and still has today an international

network of correspondents to assist its clients/assureds, along with the full financial

backing provided by the Lloyd's markets.

Notwithstanding the above, when Plaintiff requested that the initial LOU be

issued on behalf of "C.R. O'Farrell Syndicate 1036," Defendants complied in order to

facilitate the release of the attached funds.   Plaintiff then announced its alleged "run-off"

challenge to the Syndicate's active status for the first time at the June 1, 2007 hearing and

claimed it was no longer a syndicate in its own right.  The Court is respectfully referred

in this regard to paragraphs 9, 13-14, and 18-20 of the June 13, 2007 Sunley Affidavit,

which provides abundant evidence of Syndicate 1036's active status and the corporate

relationship it has to an umbrella syndicate, Syndicate 2999.  Syndicate 2999 does not

underwrite risks, but is the "focal point for reporting, management control and

administration of the five trading syndicates" within its management and administrative

control.  Id. at  paras. 13-14.  Mr. Arghyrakis' alleged "concern" about the reference to

Syndicate 1036 being "closed" (Arghyrakis Declaration at para. 19 and Exhibit 6), is also

unnecessary since, as explained by Mr. Sunley, this "means nothing more than, for

Lloyds reporting and regulatory purposes, the primary syndicate is 2999."  Moreover, the

same entry also explicity says that Syndicate 1036 is <u>not</u> in run-off.  (Sunley Reply Affidavit at para. 15)

Faced with the abundance of evidence submitted in support of Syndicate 1036's active status and financial strength, Plaintiff now alleges in its opposition papers that the Syndicate's only member, QBE Corporate Ltd. ("QBECL"), is "insolvent." (Pltf's Opp. Mem. at 2, June 18, 2007, Declaration of Epaminondas G. Arghyrakis ("Arghyrakis Decl." at para. 27).  Paragraph 21 (c) of the Sunley Reply Affidavit, however, totally rebuts this accusation by disclosing, <u>inter alia</u>, over USD 1.3 billion in assets which Plaintiff's counsel does not take into account.   The fact that QBECL has a nominal issued share capital is also immaterial given that it is a "wholly-owned subsidiary of a listed company and its capital comes from the parent company and not from third-party shareholders." (<u>See</u> Sunley Reply Affidavit at para 21(a)).

As for Plaintiff's contention that Syndicate 1036 is "no longer writing policies" (Pltf's Opp. Mem. at 2, Arghyrakis Decl. at para. 18) the Court is respectfully referred to paragraphs 9, 13, 18-20 of the June 13, 2007 Sunley Affidavit which reflects the fact that Syndicate 1036 is currently operating in the Lloyd's London Market and writes Marine and Energy policies with an underwriting capacity for the year 2007 of USD 433.4 million.

As to the 89 "company charges" reflected in Exhibit 9 of Mr. Arghyrakis' Declaration, these are far from the type of "liens and judgments" alleged by Plaintiff at page 2 of Plaintiff's opposition brief and at paragraph 28 of the Arghyrakis Declaration. The company charges are "charges which QBE is obliged by Lloyds and various state and national laws to register in order to provide security for claims before it can

underwrite business in the various jurisdictions concerned" and, in fact, "provide another layer of security for claimants." <u>See</u> para 22 of the Sunley Reply Affidavit.

With respect to the tendered LOU and the "three reasonable and basic questions" to which Plaintiff allegedly has not received clear answers, Plaintiff had previously and now again is being advised as follows:

(1)    "It is Syndicate 1036 on whose behalf the LOU has been issued and who will respond to the formal payment demands as appropriate, following any final, unappealable arbitral decision, final judgment on appeal (in the event of an appeal) or other agreement reached between the parties." (<u>See</u> Sunley Affidavit at para 26.)

(2)   As to how Deval can collect under the LOU should it prevail in the London arbitration, Mr. Sunley's Reply Affidavit at paragraph 19 sets forth the actual procedural process involved, as well as Plaintiff's recourse "assuming for some bizarre reason, the Syndicate chose to dishonour it."

(3)   As to the "reasonable assurances" Deval is requesting that the entity providing the LOU will have the assets needed to make payment,  Plaintiff need only refer to paragraphs 27-41 of the June 13, 2007 Sunley Affidavit which address in painstaking detail "The Strength of Security Furnished by Syndicate 1036" (including the Syndicate Level Assets, the Members' funds, and Lloyds Central Assets), as well as "The Resources Available to QBE Corporate Ltd."

The above is intended to respond only to the statements raised in the "Background Facts" Section of Plaintiff's Opposition memorandum of law.  The accompanying Sunley Reply Affidavit, as well as the June 21, 2007 Reply Declaration of David M. Semark, Esq., and the June 21, 2007 Reply Affidavit of Andrew Goodyear directly respond to the

remaining factual allegations contained in the June 18, 2007 Declaration of Epaminondas

G. Arghyrakis.


**ARGUMENT**


**POINT I**


**THIS COURT HAS THE AUTHORITY TO RULE UPON THE ADEQUACY OF ANY SUBSTITUTE SECURITY TENDERED BY DEFENDANTS.**


Plaintiff erroneously contends, based upon misplaced reliance on one decision out

of the Eastern District of Louisiana,[2] that this Court "is not empowered to require a

plaintiff to accept security in a form other than a bond…."   As discussed below, neither

Admiralty Rule E (5) nor the general maritime law which governs herein places any such

limitation or prohibition on the authority of this Court to do so. Quite to the contrary, the

language of Rule E (5) as well as the case law construing Rule E (5) make any security

tendered to release attached property subject to the approval of the Court.   While it has

been acknowledged that case law on this issue is "surprisingly sparse",[3] a review of the

general maritime law clearly demonstrates that federal courts freely exercise their

discretion pursuant to Rule E (5) to approve substitute security in the form of LOUs

---

[2] Thyssen, Inc. v. M/V SENA DENIZ, et al., 2000 A.M.C. 867, 2000 U.S. Dist. LEXIS 1751 (E.D. La. 2000)
[3] See  In the Matter of the Petition of SLOBODNA PLOVIDBA, an agency of the Government of Yugoslavia, as owners of the M/V JABLANICA for Exoneration from or Limitation of Liability, 1987 WL 20043 (W.D. Mich.) at *2, 1987 A.M.C. 2209, 2211.

tendered by defendants to release attached/arrested property over the objections of plaintiffs when the court deems the tendered security to be adequate.[4]

### A.  This Court's Ruling on the Sufficiency of Substitute Security Tendered to Release Attached Property is Discretionary.

While Plaintiff acknowledges that Rule E (5) empowers this Court, in the event the parties are unable to agree upon the form and amount of substitute security, to "fix the principal sum" of acceptable security, it contends that this Court "is not empowered to require a plaintiff to accept security in a form other than a bond."  (Pltf. Opp. Mem. at 3).  Nothing in the language of Rule E (5), however, limits the scope of the Court's approval to a bond in the event that the parties are unable to stipulate to an another form of security.

While there are decisions reflecting both approval and rejection of substitute security tendered in these situations, even a cursory review of these decisions makes clear that federal courts make such discretionary determinations on a case-by-case basis.   As stated by the court in the M/V JABLANICA, giving plaintiffs the "untrammeled right [to reject LOUs] in effect transfers the power to determine what is "approved security" from the court to claimants…. [S]ecurity approval matters should be within the discretion of the court, not the parties." 1987 WL 20043 at *2 (citing New York Marine Managers v. Helena Marine Service, 758 F.2d 313, 317 (8th Cir.), cert denied, 106 S.Ct. 148 (1985)).

---

[4] A thorough search of this jurisdiction's case law reveals no case analogous to the one at bar.  In fact, there appear to be only two New York federal decisions which address the issue of an LOU's acceptability in these situations, and both are factually distinguishable.  These two decisions, while inapposite, are nevertheless briefly discussed infra at Point I.B.

In Nelson Marketing Int'l, Inc. v. Wilhelmsen Lines, 2000 WL 33177235 (C.D. Cal. 2000), 2000 A.M.C. 1325, the district court similarly, relying on other Ninth and Fifth Circuit decisions, rejected the plaintiff's objection to the tendered LOU and ordered the plaintiff to accept one in a reduced amount,[5] stating that an LOU "is a proper means of securing the carrier's debt, and that the issuance of such a letter precludes the need for the arrest of a vessel and avoids the concomitant costs and delay….(citations omitted)"[6] See also, Maritima Antares, S.A. v. Vessel ESSI CAMILLA, 633 F. Supp. 694, 695 (E.D. Va. 1986) (rejecting plaintiff's argument that an LOU was less adequate than other forms of security and stating that "a letter of undertaking provides an equally acceptable means of warranting payment of damage awards.")

Similarly, in Keystone Shipping Co. v. S.S. Monfiore, 409 F.2d 1345, 1346 (5th Cir. 1969), the Court stated in this regard:  "Without a doubt a Judge, acting as a seagoing chancellor …could exert his discretion in a way to require a party to provide or accept alternative security under proper conditions but he need not."

Plaintiff herein relies solely upon Thyssen, Inc. v. M/V SENA DENIZ, et al., 2000 AMC 867, 2000 U.S. Dist. LEXIS 1751 (E.D. La. 2000), cited at page 4 of its opposition brief.  In that case, the Eastern District of Louisiana, analyzed the acceptability of a letter of undertaking issued by the U.K. P&I Club (Defendant's P&I Club herein) to release a vessel seized by the plaintiff.  Far from rejecting LOUs as

---

[5] The defendants had tendered an LOU for the full amount claimed, but, when the plaintiff rejected it and proceeded by way of ex parte application, the defendants requested the court to impose a letter in an amount which reflected the $500 per package limitation of liability under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. 1304(5).

[6] Rule E(5)(1) states that rule E(5) is intended to address in personam cases, together with in rem cases. "Except as otherwise provided, [Rule E] applies to actions [1] in personam with process of maritime attachment and garnishment [Rule B], [2] actions in rem [Rule C], and [3] petitory, possessory, and partition actions [Rule D].

sufficient substitute security or limiting defendants to bonds in all such instances, the

district court, citing the Fifth Circuit Court of Appeals, stated:

"Letters of undertaking may … secure a claim …." The Thyssen court went on to

state that "the Court encourages parties to utilize such arrangements whenever practical.

Today, the Court merely rules that it will not force an unwilling plaintiff to accept a letter

of undertaking from an *unauthorized* surety in lieu of a bond." (emphasis added)  In so

ruling, the district court expressly relied upon a Local Admiralty Rule which mandated

that, in instances of an unapproved surety, "the vessel or property shall not be released

*without an order of a judge, on reasonable notice and contradictorily, approving the*

*surety….*" See, 2001 A.M.C. at 868, n.1 (emphasis added)   Thus, even in the one

decision relied upon by Plaintiff herein, the district court acknowledged its discretion to

approve the surety and release the attached property over the objections of a plaintiff.


      **B.  The Adequacy of Substitute Security is Determined on a
          Case-by-Case Basis.**


As would be expected in discretionary matters, the case law provides no hard

and fast rules for when courts should direct the acceptance of substitute security or, under

appropriate circumstances, direct the posting of a bond.  What appears to be clear,

however, is that the burden is on the plaintiff to provide to the court a valid reason(s) why

the defendants' tendered substitute security is allegedly deficient and the restrained

property should not be released. See Thomas J. Schoenbaum, Admiralty and Maritime

Law, 532 (3rd Ed.).

    **1.  Compelling defendants to post a bond, absent "unusual" circumstances, flies in the face of the long standing practice of accepting LOUs as substitute security to release attached/arrested property.**

    In <u>Chiquita International Limited v. Liverpool and London Steamship Protection and Indemnity Association Limited</u>, 124 F. Supp.2d 158 (S.D.N.Y. 2000), 2001 A.M.C. 839, Judge Sweet commented on the "long accepted practice" of issuing and accepting LOUs to secure a plaintiff's claim:

    "On occasion, long accepted practices are challenged under an unusual fact situation, and the instant motion [seeking specific performance of a provision in an LOU which allowed the plaintiff to demand that a bond be filed] is one such instance." <u>Id</u>. at 160. Expressly because the LOU in that case unambiguously provided that the claimant could, upon demand, require the insurance company which had issued the LOU to file a bond, this Court granted the claimant's motion "with some misgiving." <u>Id</u>.   It is significant to note that in <u>Chiquita International</u>, unlike in the instant case, the London insurance company was, indeed, in run-off.  However, the fact that the insurance company in that case was actually in run-off did not seem to concern this Court since, <u>inter alia</u>, it apparently had sufficient funds in reserve to meet all of its outstanding and anticipated obligations. <u>Id</u>. at 162 – 163.

    The second and only other New York case uncovered to date which addresses this issue is <u>In the Matter of The Complaint of COMPANIA NAVIERA MARASIA S.S., as Owner of the motorvessel ATLANTICO, for Exoneration from or Limitation of Liability</u>, 466 F.Supp. 900 (S.D.N.Y. 1979), 1980 A.M.C. 388.

In this case as well, this Court acknowledged the long-standing practice in the maritime industry "to accept letters of undertaking given by underwriters, domestic or foreign, in order to avoid the detention of vessels and the expense of posting security in other forms." <u>Id</u>. commenting further upon the routine exchange of LOUs, Judge Haight stated:

> Such underwriters' letters are almost routinely exchanged in litigation between shipowners or cargo interests and shipowners, because the marine insurance world is a relatively small one, the parties, counsel and their underwriters know each other well, and are prepared to enter into such consensual arrangements so as to minimize inconvenience and expense.

<u>Id</u>.

This case is also inapposite to the one at bar, however, in that it dealt with a ship owner's ex parte application for preliminary injunctive relief under the limitation of liability statute and, as expressly distinguished by Judge Haight,:

> The inception of a limitation of liability proceeding stands upon a somewhat different posture, since the shipowner does not always know who all the claimants will be, or in what forum they may press their claims.

<u>Id</u>. at 902.

**2. Compelling defendants to post a bond absent a showing of good cause would bring about an inequitable result, undermine the very purpose of the applicable Supplemental Admiralty Rules, and set an undesirable precedent for future litigants and liability insurers.**

Defendants would finally also respectfully request that the Court take into account various commercial as well as equitable considerations arising out of this issue. Requiring defendants to post a bond in the absence of any actual deficiency in the substitute security tendered will cause not only additional inconvenience and delay, but additional expense by way of premiums to maintain such a bond. More importantly, such a precedent will invite other plaintiffs to follow suit and will thus play havoc with

the orderly and well established procedures employed worldwide to minimize the inherent disruption caused by maritme attachments and arrests.

Defendants fully agree that substitute security should be rejected whenever it is not sufficient to satisfy the potential claims of a plaintiff.   However, to give a plaintiff the unfettered ability to reject substitute security without proving that it is indeed inadequate defeats not only the underlying purpose of  the Supplementary Admiralty Rules, but also all of the commercial considerations and equitable principles which underlie the entire concept of LOUs, the traditional substitute security provided by liability insurers.

As noted at paragraph 19 of the June 21, 2007 Reply Affidavit of Andrew Goodyear ("Goodyear Reply Aff.") submitted herewith,  a ruling by this Court in favor of Plaintiff's groundless opposition to the tendered LOU will severely compromise the present and future ability of the Charterers P&I Club and other fixed premium providers of charterers' liability insurance to offer the cover they currently do.  It will also, as a consequence, leave many owners without recourse to commercial underwriters if their claims for damage, death and pollution, etc. are then found to be the charterers' responsibility.

While bank guarantees and letters of credit are a theoretical alternative, in practice, obtaining them is much more difficult, time consuming and costly, as explained in the June 4, 2007 letter from the Bank of America (Mary L. Mcinnis to Defendant Miachart (Jose Pereira). (See copy attached as Exhibit C to the June 21, 2007 Reply Declaration of Mary Ann C. Marlowe, Esq. ("Marlowe Reply Decl.").  Thus, as in the instant case, these "alternatives" are not viable options for many defendants.   This is one

of the main reasons maritime entities become members of fixed premium providers, P&I

Clubs, and other mutual associations which make such letters of undertaking available to

their members.  (See paras. 10-13 of Goodyear Reply Aff.)

Given the financial information disclosed in both the initial, June 13, 2007

Affidavit and the June 21, 2007 Reply Affidavit of Myles A. Sunley, there is no reason

whatsoever to believe that Plaintiff would have any difficulty in enforcing Syndicate

1036's Letter of Undertaking. Nor is there any reason to suspect that either the

Charterers' Club or Syndicate 1036 would damage their credibility and, in turn,

jeopardize their excellent reputations in the marine insurance industry by defaulting on

any obligation.  (Goodyear Reply Aff. At para. 18)   To say that the LOU in question is

"adequate" in the context of this relatively minor obligation is an understatement.

### 3.  Plaintiff impliedly accepted letters of undertaking issued by the Charterers P&I Club at the time of contracting.

As pointed out at the outset of the June 21, 2007 Reply Declaration of David M.

Semark, the parties' agreed to include in the charterparty a provision whereby Defendants

were to be covered for Charterers liabilities by the Charterers P&I Club and the Plaintiff

by the UK P&I Club.  (See Semark Reply Declaration at para. 3.)  The parties'

acceptance of this provision thus reflects their mutual acceptance of their respective

sureties and the possible future LOUs which would be issued by these entities. It is

therefore arguable that by so accepting this term, Plaintiff waived any right to reject a

Charterers P&I Club LOU which would be tendered in connection with a claim arising

out of the charterparty.  Plaintiffs' current refusal to accept the Charterers P&I Club LOU

is therefore a breach of this charterparty provision. Id.

Moreover, as established above, and by Plaintiff's own admissions in court and in its papers, it is undisputed that LOUs have long been accepted as substitute security to discharge Rule B attachments and in rem arrests pursuant to Supplemental Admiralty Rule C.   Indeed, in Plaintiff's letter to the Court dated June 4, 2007, opposing counsel specifically stated that Plaintiff "Deval is willing to accept a satisfactory LOU … so long as Plaintiff is assured it will be able to present the LOU to an identified source who will honor it …."  In a follow-up letter to the Court the next day, Plaintiff again indicated its willingness to accept an LOU, "so long as that substitute security is reasonably certain to result in payment to Plaintiff within a reasonable time upon proper demand." (See Exhibits D and E to the June 21, 2007 Marlowe Reply Declaration)

The issue before this Court, therefore, is not whether an LOU constitutes acceptable substitute security herein, but rather whether the specific LOU tendered by Defendants provides sufficient security to satisfy any potential award Plaintiff seeks to obtain in the London arbitration proceeding.

The initial June 13, 2007 and June 21, 2007 Reply Affidavit of Myles Sunley, as well as the June 21, 2007 Reply Affidavit of Andrew Goodyear and the June 21, 2007 Reply Declaration of David M. Semark leave no doubt that the tendered LOU herein constitutes more than acceptable substitute security.  Defendants have thoroughly addressed and put to rest each and every alleged concern expressed by Plaintiff's counsel, by the documentation and information presented both to the Court and Plaintiff's counsel herein.

By contrast, Plaintiff has merely offered to provide a corporate LOU from Plaintiff in response to Defendants' demand for counter security.  As correctly pointed

out by Mr. Semark at paragraphs 24-26 of his Reply Declaration, Plaintiff is challenging an LOU put up by a "specialist charterers' liability underwriter, domiciled in the jurisdiction where the arbitration will take place, backed by US$1.6 billion in ring-fenced combined syndicate assets and Members' Funds at Lloyds, set aside for the express purpose of meeting claims…." At the same time, Plaintiff is suggesting that Defendants should simply accept counter security from their adversary herein, a company domiciled in Turkey, which backs its tendered LOU only with an unsupported allegation that it is worth "*tens of millions of dollars*".[7]

Plaintiff's unacceptable tender of its own LOU will be more fully addressed in the second half of Defendants' instant motion. For now, suffice to say, that the disparity between what Plaintiff is tendering and what it is allegedly challenging reveals, at the very least, the disingenuous nature of Plaintiff's contention herein.

## POINT II

### THIS COURT HAS ALREADY RECOGNIZED THE ACCEPTABILITY OF THE CHARTERERS P&I CLUB LOUs

As, "the leading underwriter to many International Group P&I Associations, providing extended coverage's over and above those offered by the Club Rules as well as reinsurance capacity and solutions,"[8] Syndicate 1036 has issued at least eight LOUs during 2006 and 2007, of which three were issued to secure Rule B attachments. Id. at para. 17.    All of these were issued by Michael Else & Co. on behalf of Syndicate 1036

---

[7] As noted at footnote 1 of Mr. Semark's Reply Declaration, Charterers' counter claim for hire and detention does not fall within Plaintiff's P&I cover and, as a result, Plaintiff will not be able to tender a UK P&I LOU to Defendants at all.

[8] See, para. 15 of Reply Affidavit of Andrew Goodyear.

Id.  Since these LOUs were all issued pursuant to charterers' liability cover, and since Syndicate 1036 underwrites many other types of risks, the Syndicate has undoubtedly secured many other claims. Id.

As Andrew Goodyear points out at paragraph 18 of his Reply Affidavit, he is aware of no instance in which an LOU issued by Michael Else on behalf of Syndicate 1036 has ever been dishonored.  Nor has Plaintiff begin to support any alleged concern, genuine or otherwise, that Syndicate 1036 might default with respect to the LOU tendered herein.

## CONCLUSION

For all of the foregoing reasons, as well as those contained in the accompanying Reply Affidavits of Myles A. Sunley, Andrew Goodyear, and the Reply Declarations of David M. Semark, Esq. and Mary Ann C. Marlowe, Esq., filed herewith, Defendants respectfully request that the funds of Defendants now restrained should be released, the present Rule B attachment now in place pursuant to this Court's April 30, 2007 Order should be vacated, and Plaintiff should be directed to accept the LOU tendered by Defendants as agreed upon to date by the parties' respective London solicitors.

Dated:  New York, New York
         June 21, 2007

KEANE & MARLOWE
Attorneys for Defendants
Repinter International Shipping Co. S.A.
and Miachart Corporation LLC

s/_____
Mary Ann C. Marlowe (MM 0723)
Christopher P. Keane (CK 4394)
197 Route 18 South, Suite 3000
East Brunswick, New Jersey 08816
(732) 951-8300

300 Park Avenue – 17th Fl
New York, New York 10022

TO:  Freehill, Hogan & Mahar, LLP
      Attorneys for Plaintiff
      Deval Shipping & Trading Co.
      80 Pine Street
      New York, New York 10005

Attn: Michael Unger, Esq. (MU 0045)
       Lawrence Kahn, Esq (LK 5215)