KEANE & MARLOWE, LLP
Attorneys for Defendants
REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION LLC
197 Route 18 South Suite 3000
East Brunswick, New Jersey 08816
(732) 951-8300
Mary Ann C. Marlowe (MM-0723)
Christopher P. Keane (CPK-4394)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DEVAL DENIZCILIK VE TICARET A.S.,

                 Plaintiff,　　　　　　　　　**REPLY AFFIDAVIT OF**
　　　　　　　　　　　　　　　　　　　　　　　　**MYLES A. SUNLEY**
-against-
　　　　　　　　　　　　　　　　　　　　　　　　**07 Civil 3397 (JGK)**
REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION　　　　**ECF CASE**
LLC.,

                 Defendants.
------------------------------------------------------------x

MYLES A. SUNLEY, being duly sworn, deposes and says:

1. I am a Senior Claims Adjuster of the C.R. O'Farrell Syndicate (Lloyd's Syndicate No. COF 1036) ("Syndicate 1036") at Plantation Place, 30 Fenchurch Street, London EC3M 3BD. I have a Bsc (Hons), am an Associate of the Chartered Insurance Institute as well as a Chartered Insurer. I have been involved in the field of marine insurance and re-insurance for 11 years.

2. I remain duly authorized by Syndicate 1036 to make this Affidavit in further support of the application brought by Repinter International Shipping Co. S.A. and Miachart Corporation, LLC., ("Repinter-Miachart"), the Defendants/Charterers in the above-captioned action to have the attachment released against a Letter of Undertaking put up by Syndicate 1036.

3. I make this Affidavit based upon the facts and matters within my personal knowledge and upon the information provided to me by Defendants' English and United States counsel, namely, Reed Smith Richards Butler LLP and Keane and Marlowe, LLP, respectively.

4   I have read the affidavit of Epaminondas G. Arghyrakis filed in these proceedings and respond to Mr Argyrakis's contentions insofar as he contests the status and solvency of Syndicate 1036 and its corporate member, QBE Corporate Ltd as set out further below.

**Paragraphs 10-12**

5   As the signature block at the end of the LOU makes clear, the security tendered in this matter has always been tendered by Michael Else & Company as agents for Syndicate 1036 for and on behalf of Syndicate 1036. This is pursuant to a Power of Attorney given to Michael Else & Company by the Syndicate.

6   When the LOU was first tendered to the Claimants, the Claimant's US attorneys confirmed on 15th May that they were in principle prepared to accept the LOU as substitute security for the sums attached in this action provided that the syndicate gave a 2nd, separate undertaking [Exhibit 1].

7   Owners were then provided with a copy of the Power of Attorney issued to Michael Else & Co authorising them to bind the Syndicate to Letters of Undertaking to demonstrate that no "separate" LOU from the Syndicate was necessary, as the LOU was in fact given on behalf of, and bound, Syndicate 1036 [See Exhibit 3 to my initial Affidavit of 13th June Affidavit].

8   I am advised by Mr Semark that Owners' reversal of their previous acceptance of the LOU came after, (as foreshadowed in Mr Unger's email of 15th May, and highlighted in paragraph 35 of Mr Argyrakis's affidavit), Owners had demanded that Charterers relinquish any claim to counter-security and Charterers had refused to do so.

9   I respectfully submit that it would be reasonable, in the light of their previous in principle acceptance of the LOU, to conclude that Owners' present challenge to the solvency of the Syndicate and its Corporate Member is not based on any genuine concern that the Syndicate and QBE Corporate Ltd may not be able to meet the relatively modest sums secured by this undertaking, but is a tactical ploy, designed to pressure Charterers to surrender their right to seek counter-security.

**Paragraphs 15-20**

10  Aside from the information allegedly revealed to Mr Argyrakis by his unidentified Lloyds Broker, there is nothing in Exhibit 4 or Exhibit 5 to his affidavit which would give

rise to any reasonable inference that the Syndicate is, or was ever, in run-off. These exhibits simply show that for administrative reasons Syndicate 1036 no longer operates completely independently, but is part of a larger umbrella syndicate. Many other Lloyds syndicate operate in the same manner.

11. The fact that the sub-syndicates share a common corporate member means there is a far larger pool of resources from which claims can be met. It is a measure which increases the stability of the syndicate, not one which calls it into question.

12. This, as well as the continued existence of Syndicate 1036, is demonstrated by the very documents relied upon by Mr Argyrakis (but he has not chosen to draw the Court's attention to this). As the comment on numbered pg 2 of Exhibit 5 to Mr Argyrakis's affidavit states:

> *AT A GLANCE*
>
> *For 2007, Syndicate 2999 comprises five sub-syndicates with a combined underwriting capacity of £780 million and is the primary entity from a Lloyds Reporting and Regulatory Perspective*
>
> *2999 is a wholly aligned syndicate, whereby 100% of its capital is provided by the QBE Insurance Group. Sub-Syndicate capacity allocations are not restrictive and may be adjusted within the overall umbrella allocation. This means the team can respond to underwriting opportunities as they arise, whilst minimising the cost of capital provision.*
>
> *Each of the sub-syndicates (referred to herein as syndicates have established licences and premium trust funds under their own number for the specific types of business they underwrite. They are all licensed and accredited to underwrite both surplus lines and re-insurance business in the United States and have funded trust funds in accordance with local regulatory requirements.*

13. As far as the reference to the premium trust funds referred to in the above extract from Exhibit 5 to Mr Argyrakis's affidavit is concerned, and as mentioned in paragraph 34 of my first affidavit, I have asked the QBE Finance Department to compute the current level of syndicate level assets held by syndicate 1036 as Premium Trust Funds. As the attached letter from Mr David Winkett, our finance director, makes clear, as at 31st May these exceeded £275 million or US$548 million on current rates of exchange. [Exhibit 2]

14    Mr Winkett's letter also confirms that the syndicate's corporate member, QBE Corporate Ltd currently has over £530 million (i.e. US$1.054 billion) in secured funds at Lloyds to meet claims.

15    As far as the online directory entry in Exhibit 6 is concerned, the reference to the syndicate being "closed" means nothing more than for Lloyds reporting and regulatory purposes, the primary syndicate is 2999. The entry does however say explicitly that the Syndicate 1036 is **not** in run-off.

**Paragraph 22**

16    As to the correspondence sent to the Syndicate by Mr Arghyrakis between 25th May 2007 -31st May 2007, I had no idea at the time who Mr Arghyrakis was or who he represented, but in any event it is not our policy to correspond directly with lawyers representing claimants against our policyholders where the policyholders have their own legal representatives on record.

17    3 days prior to Mr Arghyrakis's fax of 25th May, Mr Semark of Reed Smith Richards Butler LLP wrote to Mr Arghyrakis advising that Reed Smith Richards Butler LLP were on record for the Charterers and challenging the rejection of the LOU [Exhibit 3]. Mr Arghyrakis declined to engage with Reed Smith Richards Butler LLP allegedly on the basis that *"our respective clients are in direct contact"* [Exhibit 4]. However, whilst purporting to *"note [Reed Smith Richards Butler's] interest in case our involvement is necessary in the future"*, I am advised that Mr Arghyrakis did not address any of his inquiries between 25th May 2007 -31st May 2007 to Mr Semark, despite prior notice that he represented Charterers in this matter.

18    I had in fact already sent, at the request of Mr Andrew Goodyear of Michael Else & Co, a copy of the letter confirming that the Power of Attorney given by Syndicate 1036 to Michael Else & Co to issue letters of undertaking on the Syndicate's behalf was still valid, and assumed that this would answer any reasonable concerns that Owners might have had.

19    I do not see how it follows that Mr Arghyrakis's failure to direct his inquiries regarding the security tendered by Charterers to Charterers solicitors of record can be grounds for concluding that *"future efforts to enforce an LOU for over US$1million will meet with much greater difficulty"*.

20    The LOU makes it clear that proceedings to enforce the LOU are to be brought against the syndicate's corporate member, QBE Corporate Ltd, in the English High Court. QBE Corporate Ltd is an English Company. Were the LOU to become enforceable after a final Award or judgment on appeal tomorrow, there would be over US$548 million in syndicate assets, and, as Mr Winkett's letter makes clear, over US$1.054 billion in QBE Corporate Ltd's Funds at Lloyds against which the LOU could be enforced, assuming, for some bizarre reason, the Syndicate chose to dishonour it.

**Paragraphs 23-28**

21    In these paragraphs, Mr Arghyrakis attacks the solvency of QBE Corporate Ltd, describing it at paragraph 27 as "insolvent".

22    QBE Corporate Ltd is not insolvent, nor would it be allowed to act as a Corporate Member of Lloyds if it were. I correct Mr Arghyrakis's misrepresentations below:

(a)    There is nothing "surprising" in the fact that QBE Corporate Ltd has a nominal issued share capital. As a wholly-owned subsidiary of a listed company, its capital comes from the parent company, not from 3rd party shareholders.

(b)    A company is insolvent if it is not able to pay debts as they fall due. Had the auditors, Pricewaterhouse Coopers LLP any concerns in this respect, they would have been legally obliged to qualify the accounts accordingly. There is no such qualification.

(c)    While it is true that in 2005, there was an accumulated deficit of £32,474,000 on the profit and loss account, (due principally to hurricanes Katrina, Rita and Wilma, as note 18 to the accounts make clear), Mr Arghyrakis ignores the fact that in 2005 the company had off-balance sheet assets, in the form of Members Funds at Lloyds, in the sum of £660,900,571 (or US$1.31 billion) with which to meet claims (note 19 to the financial statements). This is over 20 times the sum Mr Arghyrakis says "proves" the company is insolvent.

23    As to the Company Charges, at exhibit 9 to Mr Arghrakis's affidavit, he appears not to have read these. These are charges which QBE is obliged by Lloyds and various state and national laws to register in order to provide security for claims before it can underwrite business in the various jurisdictions concerned. They provide another layer of security for claimants:

(a) For example, the first of these secures *"all the underwriting obligations of the company as an underwriting members of the society (Lloyds)"* – in other words, underwriting obligations of the sort secured by the present LOU. [See p.2 of Exhibit 9 to Mr Argyrakis's affidavit]

(b) Mr Argyrakis also fails to draw the Court's attention to the fact that several of these charges exist specifically to secure liabilities underwritten by Syndicate 1036 (the syndicate Mr Argyrakis claims does not exist) in the United States [See pp 46, 47, 49 and 54 of Exhibit 9 to Mr Argyrakis's affidavit]

**Paragraphs 29 - 31**

24  Mr Argyrakis, despite admitting in paragraph 31 of his affidavit, that he does not know if what he is saying is correct, claims that neither the syndicate assets nor the Members Funds would respond if a claim on the LOU was dishonoured. I am happy to put him straight.

25  Quite simply, one of the risks we underwrite is Charterers' liability to 3rd parties. One of the benefits holders of our policies enjoy, is the right to have these liabilities secured if the cover responds. In this case, the cover has responded, and, if a liability is found by an arbitration tribunal, or Judge on appeal, to exist, an action by the beneficiary of the guarantee to enforce it would have the same claim on the resources which exist to satisfy claims as would be the case with any other claim we underwrite.

**Paragraphs 33 - 34**

26  There can be no genuine need for QBE Corporate Ltd's parent company to provide a separate undertaking for a US$1 million claim. Syndicate 1036's 2007 underwriting year is currently backed by over US$548 million in syndicate assets, and QBE Corporate Ltd has over US$1.054 billion in Funds at Lloyds. There is therefore US$1.6 billion in funds set aside, as a ring-fenced reserve to meet claims.

27  As pointed out in paragraph 41 of my first affidavit, by contrast, Owners' own P&I Club has relatively modest free reserves, of only US$263 million – a fact which Mr Argyrakis does not dispute. His clients have been offered security by an entity with ring-fenced reserves 6 times greater than their own P&I Club – his challenge to its adequacy cannot be sustained.

## CONCLUSION

28   For the reasons set out above, and in my first affidavit, I respectfully submit that there cannot be any genuine doubt concerning the sufficiency of a Letter of Undertaking put up on behalf of Syndicate 1036 as substitute security for the funds currently restrained pursuant to this Court's April 30, 2007 Order of attachment, or for Rule B attachments generally.

_____
Myles A. Sunley

Sworn to before me

this 21st day of June, 2007

_____
Commissioner of Oaths.

```
BARLOW LYDE & GILBERT LLP
BEAUFORT HOUSE
15 ST. BOTOLPH STREET
LONDON, EC3A 7NJ
```