KEANE & MARLOWE, LLP
Attorneys for Defendants
REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION LLC
197 Route 18 South Suite 3000
East Brunswick, New Jersey 08816
(732) 951-8300
Mary Ann C. Marlowe (MM-0723)
Christopher P. Keane (CPK-4394)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DEVAL DENIZCILIK VE TICARET A.S.,       REPLY DECLARATION OF
    DAVID MARTIN SEMARK

                        Plaintiff,

-against-

                                        07 Civil 3397 (JGK)

REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION
LLC.,

                        Defendants.
-----------------------------------------------------------x

DAVID MARTIN SEMARK pursuant to 28 U.S.C. §1746 hereby declares and says the following, under penalty of perjury:

1    I am a solicitor of the Supreme Court of England and Wales and a partner in the firm of Reed Smith Richards Butler LLP, in their London office situated in Beaufort House, 15 St Botolph Street, London EC3A 7EE.

2    I make this declaration based on the facts and matters within my own personal knowledge, and in response to certain points raised in the declaration of Mr Epaminondas Arghyrakis dated 18th June 2007, which I address below.

3    As a preliminary point, I respectfully submit that it is not open to the Owners to challenge the sufficiency of the Letter of Undertaking tendered. This is because it was a matter of mutual, prior agreement, at the time of contracting, that Charterers would be covered for charterers' liabilities by the Charterers P&I Club and the Owners by the UK P&I Club.

    This was recorded as a formal term of the Charterparty - in Clause 38 [Exhibit 1] which was accepted by Owners without objection. I respectfully submit that acceptance of this term impliedly included Owners' acceptance of the Letters of Undertaking put up by the Charterers P&I Club to secure such liabilities. Owners' current refusal to accept the LOU is therefore a breach of charter.

4    In paragraphs 4 to 9 of Mr Arghyarakis declaration, he makes various assertions on the merits of this matter. I am unclear why Mr Arghyarakis felt compelled to make these points, given that the only issue before the Court was the acceptability or otherwise of a letter of undertaking tendered by Syndicate 1036.

5    However, as Mr Arghyarakis mischaracterises the substance of the dispute, I draw the Court's attention to the following facts and matters.

**MIACHART DID NOT GUARANTEE THE CHARTER**

6    Mr Arghyarakis makes great play of the fact that the Second Defendant Miachart Corporation LLC of Miami ("Miachart") allegedly guaranteed Repinter's performance of the charterparty.

7    As Mr Arghyarakis knows, as a matter of English law, there is only a binding contract of guarantee where there is a separately executed written guarantee signed by the alleged guarantor of a charterer's performance: *The Anangel Express* [1996] 2 Lloyds Rep. 299 [Exhibit 2].

8    As far as I am aware Owners failed to draw up a guarantee. It is common ground that no such document was ever executed by Miachart. Accordingly, Miachart did not guarantee the performance of Repinter's obligations, as Mr Arghyarakis alleges.

9    In any event, under English law, a party who guarantees the debt of another party only assumes a secondary liability. This means that the guarantor is under no obligation to pay, until the party whose obligations she has guaranteed fails to honour her primary liability. Accordingly, even if Owners had procured a performance guarantee from

Miachart, they would still have to proceed against Repinter and fail to obtain payment before they could proceed against Miachart.

10  Be that as it may, the LOU tendered responds to both the liability that Repinter may have, as well as any liability that Miachart may be found to have.

11  Indeed, as far as Charterers are concerned, the point is largely academic on any analysis. If the Owners' claim is accepted by the Tribunal, the guarantee will respond in any event – to Repinter's liability, if not Miachart's.

12  Accordingly, for the purposes of resolving the impasse which has arisen Miachart has indicated to the Owners that they are prepared to waive the guarantee point, provided the Owners accept the LOU. Owners have refused to do this.

**LIABILITY IS IN DISPUTE**

13  As to the balance of Mr Arghyarakis's assertions on the merits:

(a)  The alleged stevedore damage occurred during a period in which the vessel was the subject of three charters. Owners had chartered her to Repinter, Repinter had sub-chartered her to Belarussian Shipping Company ("BSC") and BSC in turn had sub-sub chartered her to Wajilam Exports Singapore Pte Ltd.

(b)  Accordingly, although it is Repinter and Miachart's funds which have been attached, in essence, this is a dispute between the Owners and the Sub-Charterers, or even the Sub-Sub Charterers.

(c)  There is a considerable dispute on the facts as to whether the damage was indeed of a severity affecting the vessel's class or her trading capabilities. The Sub-Charterers claim:

(i)  That all the stevedore damages were repaired when the vessel discharged the logs at Kandla, India.

(ii)  That the remaining items of damage which Owners claim were caused by the stevedores were either old damages, which the Owners are now

        seeking to have repaired at Charterers' expense, or damage which was so minor that it must be classified as ordinary wear and tear.

(iii)     The sub-charterers also claim that they paid US$3,500 directly to the Master, after the conclusion of the discharge port repairs, in full and final settlement of any remaining liability, on the basis that any remaining repairs would then be carried out by the crew.

(iv)     That when the Owners asserted at Adabiya, Egypt that further repairs were necessary, the Owners deliberately obstructed the performance of the repairs which Sub-Charterers stood ready to carry out (under protest and with full reservation of their rights) because the Owners insisted that all the "damage" be repaired, not simply those items identified by Class as being necessary prior to the vessel's sailing. [Exhibit 3]

14     It was this obstruction which led to BSC terminating the charter, causing:

(a)     A loss to Repinter of US$556,127 in hire withheld by BSC.

(b)     An exposure of US$390,322 in claims advanced by BSC against Repinter as a consequence of Owners' actions.

15     The merits or otherwise of each party's position will have to be determined by the London Arbitration tribunal hearing the evidence from both the head owners and the sub charterers and any Judge in the event of an appeal. However, on any analysis, liability is far from as clear-cut as Mr Arghyrakis suggests.

**REPINTER DID NOT ABANDON THE FIXTURE**

16     It also incorrect for Mr Arghyarakis to claim, as he does in paragraph 7, that *"the Charterers gave the vessel no further orders, abandoning her at a non contractual redelivery point with insufficient bunkers"* after BSC terminated the sub-charter.

17     In fact, even though BSC had terminated the sub-charter, Repinter told Owners that they were willing to carry the repairs necessary to allow the vessel to sail (albeit under protest) [Exhibit 4].

18  Owners replied saying that the repairs would now be done by the crew and that the vessel would be taken off to drydock [Exhibit 5].

19  There was clearly no "abandonment" as Mr Arghyarakis claims.

**REPINTER'S COUNTER-CLAIM EXTINGUISHES ANY SUMS DUE TO OWNERS**

20  As to Mr Arghyarakis's assertion that *"Charterers have admitted substantial proportions of the Owners' claim,"* it is true that Charterers are prepared to credit Owners for the Suez Canal dues paid by the vessel when she transited the Suez Canal and the normal repayment in respect of bunkers due on redelivery, in their Final Hire Statement.

21  However, any amount otherwise payable to Owners is extinguished by Charterers' claim against the Owners. This far exceeds the Suez Canal dues and redelivery bunkers.

**MISCELLANEOUS**

22  It is also noteworthy that Owners commenced these Attachment proceedings before the alleged repairs to the vessel had even been concluded. The alleged repairs were only complete on 5th May 2007, whereas the Owners commenced these proceedings on 30th April.

23  I am not aware of any demand by the Owners that Miachart "honour" their (non existent) guarantee prior to the institution of these proceedings.

24  In paragraph 35 Mr Arghyarakis tries to claim that Charterers should content themselves with a corporate undertaking from the Owners on the basis that they own *"some 9 vessel's in* [their] *name, worth tens of millions of dollars"*.[1] As to this, and leaving aside the fact that the value of the vessels is mere unsupported assertion on Mr Arghyarakis's part, (the likelihood is that they are all heavily mortgaged in any event):

(a)  I point out the irony of Owners' challenge to an LOU put up by an independent, specialist charterers' liability underwriter, domiciled in the jurisdiction where the arbitration will take place, backed by US$1.6 billion in ring-fenced combined

---

[1] No doubt because a claim for hire and detention, (which is the essence of the Charterers' counter-claim) would not fall with Owner's P&I Cover.

        syndicate assets and Members' Funds at Lloyds, set aside for the express purpose of meeting claims, in circumstances where they suggest Charterers should take security from a company domiciled in Turkey, on their basis of their word that these are worth *"tens of millions of dollars"*.

    (b)    Self-evidently, security from the vessel-owning company is not independent security at all. Charterers contracted directly with Owners, and so a corporate letter from Owners saying that they undertake to be bound by the result of the arbitration does no more than express what Owners would already be obliged to do in any event.

    (c)    Such a letter would give Charterers no greater rights than they currently have, and could not in any sense be regarded as being adequate security.

25    This demand by Owners, that Charterers take their corporate IOU as security for their counter-claim, does however highlight what the Owners' challenge to the syndicate LOU is all about, it is a tactical device, designed to force Charterers to give up or compromise their own claim for counter-security.

26    Charterers have tendered first-class security. They seek the release of their and Miachart's funds from attachment, and the Court's protection against Owners' efforts to strongarm them into abandoning or compromising their right to counter-security. This is behaviour which, I respectfully submit, also entitles Charterers to an award of costs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London, United Kingdom
21st June 2007

*[signature]*

DAVID MARTIN SEMARK