FCJ's response was to ask for a figure of U.S.$1 m. to be inserted in the guarantee (see B2/71). This seems to link with a copy of the guarantee at p. 78 of the Bundle which has FCJ's writing "up to an amount of U.S.$1 m."

The owners countered for a guarantee of U.S.$ 2 m. (see Kilgours to FCJ at 15 06 on May 14, 1993 (B2/72)).

Ultimately, at 19 46 that evening negotiations were fixed firm "on subjects". Kilgours confirmed to FCJ —

> ... sub bunker quantities, sub details and sub charterers reconfirmation by 4pm London time on Monday.

That reconfirmation referred to a provision at the end of the telex stating —

> ... charterers agree to performance guarantee to be as per Owners wording on Newco letter headed paper and signed by Newco with the insertion in line 4 after "same" — up to $1\frac{1}{2}$ m. US$.

Two points are of importance. First, (as I have already indicated), Newco had at this stage not been informed of the requirement for a guarantee. Second, albeit it was clear from the negotiations between Mr. Sayers and Mr. Buesig of FCJ that one reason why confirmation had to wait was because Newco had to be contacted, the terms of the confirmation were that "charterers" should agree to a performance guarantee signed by Newco. Mr. Sayers in his evidence, who was negotiating on behalf of Kilgours, was quite clear that what he was expecting at this stage was the agreement of charterers that a guarantee from Newco would be supplied.

Mr. Kunz of Newco had in fact been away in the week up to and including May 14, 1993. That may be one reason why Newco had never been contacted in relation to the possibility of giving a guarantee. In any event he returned to the office on Monday May 17, 1993. At the same time Mr. Frank Eger of FCJ returned to the office to deal with the matter in place of Mr. Buesig. Mr. Eger was most unenthusiastic about the fact that any guarantee from Newco had been offered. It is not precisely clear to me whether that was after contact with Zaco and via Zaco with Newco or not, but it matters not, because both Mr. Eger and Newco, once they knew about it, were unenthusiastic about the offer of a Newco guarantee.

During Monday May 17, 1993, owners through Kilgours and Mr. Sayers maintained their position that a guarantee was necessary and to some extent they relied on the fact that charterers had already agreed to a U.S.$1.5 m. guarantee. When Newco were contacted by Mr. Kehr of KSH, Mr. Kunz for Newco was adamant, at least at first, that Newco's exposure should not exceed their freight liability. This was Mr. Kunz's own evidence and is supported by the statement put in under the Civil Evidence Act of Mr. Kehr. Newco were however prepared to assist up to their freight liability. Their freight liability was calculated both by them and owners as about U.S.$1.1 m.

Owners were not prepared to accept a guarantee limited to U.S.$1.1 m. and were insistent upon a guarantee of U.S.$1.5 m.

There was clearly some discussion between Mr. Kunz and Mr. Kehr relating to a financing procedure which would involve Newco paying their freight liability directly to owners up to the amount of Newco's freight liability but in respect of KSH's liabilities for ballast bonus and hire. Telexes dealing with this were exchanged between Zaco and Newco on May 17, 1993 in the afternoon (see B2/101). Those telexes are timed at 3 41 in the afternoon which is coming close to the time by which KSH had to reconfirm to owners if they were to fix the vessel.

In relation to the above there is very little dispute.

There is also no doubt that by the end of the afternoon Mr. Eger, on behalf of FCJ, had confirmed to Mr. Sayers, for Kilgours, that a guarantee would be produced, but the words in which he did so, as Mr. Sayers himself confirmed, are set out in the telex at p. 136 of the Bundle as follows:

> Charterers agree to performance guarantee to be as per Owners wording on Newco letter headed paper and signed by Newco with the insertion in line 4 after "same" — up to $1\frac{1}{2}$ m. US$.

That telex in fact also indeed confirmed details and all important terms as agreed between owners and charterers.

Strangely, when Kilgours telexed owners the terms of the fixture, they set out all terms as per the telex to FCJ but without the term relating to the performance guarantee as quoted above. The explanation of Mr. Sayers for that term not being in the telex to owners was that he was telexing Mr. Pat Clinkskel on behalf of owners who was dealing with details, whereas it was Mr. John Merrett, who gave evidence before me, who was dealing with the question of the guarantee, and the evidence of Mr. Sayers was that he had confirmed orally to Mr. John Merrett that a Newco guarantee was to be supplied. There is no doubt that Mr. Merrett, (whose evidence I accept entirely), thought that he was getting confirmation *on behalf of Newco* that they would issue a performance guarantee, and not simply a confirmation from charterers. I have to say that I find Mr. Sayers' explanation for not putting all terms as confirmed to FCJ in the telex to owners,

not altogether satisfactory since it seems to me that when one looks at Mr. Sayers' notebook relating to the negotiations, matters are not quite so clear cut so far as negotiating the guarantee or details with the different representatives of owners. In any event, this was such an important term — why not put it in? One explanation for not putting it in is that it makes clear that in fact all Kilgours had at this time was an agreement from charterers that they would produce a guarantee from Newco as opposed to any agreement from Newco. The expectation would have been that a guarantee would be forthcoming and thus no problem would arise, but the only bargain which Kilgours had was in fact with charterers.

In any event, two questions arise at this stage; first is the question whether Mr. Kunz, on behalf of Newco, agreed with anyone to provide a guarantee as opposed to agreeing that he would consider giving one; second would arise the question whether, even if he did agree to give a guarantee, whether he authorized KSH to give that guarantee on behalf of Newco, or whether he left it to Newco to decide precisely what it would agree. Certainly on the wording of the telexes at this stage, the maximum which owners appear to have obtained is an agreement of the *charterers* to provide a performance guarantee from Newco.

Let me however consider those questions further by reference both to the evidence and to the sequence of events thereafter.

On the documents, what happens after the confirmation on May 18, 1993 is as follows. First, Zaco wrote to Novacom copy to Newco, confirming yesterday's agreement that they had fixed *Anangel Express* for performing the above cargo. At the conclusion of that telex they said:

> Thanks support for fixing this vessel especially for performance guarantee as agreed.

What Mr. Kunz said in his evidence about this sentence was that he must have seen the telex at an earlier stage but that he could not recall noting the reference at the bottom to a performance guarantee. He said that if he had seen it then he would have taken it to be a reference to Newco's willingness to provide a guarantee up to the level of Newco's freight commitment if a guarantee was still required. It is perhaps important at this stage to go into the difference between the evidence of Mr. Kehr and Mr. Kunz as to what occurred on May 17, 1993.

Mr. Martin Kehr did not give evidence at the trial. It would seem that he originally gave a statement to Newco, that statement being taken by Mr. Jung the secretary of Newco, with the assistance of Mr. Kunz. It is quite clear that the way in which that statement was taken was by Mr. Kunz telling Mr. Jung the way in which he said that negotiations between him and Mr. Kehr went and trying to get Mr. Kehr to sign the statement accepting that position. Mr. Jung and Mr. Kunz said that when they met Mr. Kehr he in fact did accept the position as put forward in the draft statement prepared at that stage. There was however some dispute about the payment of sums which Mr. Kehr said were due to him and it is on that basis that they say the statement was never in fact signed.

Mr. Kehr's statement at that stage would have supported Mr. Kunz's evidence which was to the effect that when asked by Mr. Kehr to consider giving a performance guarantee, first, Mr. Kunz was very reluctant to do so; second, he refused to do so insofar as it meant going beyond Newco's freight commitment; and third, that thus the understanding was that if a guarantee were to be given, it would be necessary for Newco to arrange the completion cargo or at the very least receive money that would otherwise be payable to KSH from Metallgesellschaft, the shippers of the completion cargo. Mr. Kunz before me was quite clear that all he ever said was that he would consider giving a guarantee either within the limits of Newco's freight commitment including, if it could be arranged through Newco, the freight for the completion cargo. Alternatively, he would consider a guarantee of U.S.$1.5 m. provided that insofar as that exceeded Newco's freight commitment, Newco obtained some form of security over the completion cargo proceeds. He accepted in answer to questions from me that if, as a fact, some arrangement had been made in relation to that cargo which would have provided Newco with the difference between Newco's own freight commitment and U.S.$1.5 m., and if a guarantee had been actually asked for, there is little question that Newco would have supplied it.

Mr. Kehr provided a statement to the plaintiffs' solicitors. That has been put in as a Civil Evidence Act statement and has not been cross-examined to. In that statement there was nothing about Mr. Kunz simply being prepared to consider a guarantee and nothing about any guarantee that would be on offer being subject to any arrangement in relation to the completion cargo. Mr. Kehr stated in par. 13 as follows:

> Following all the long discussions Zaco, through Mr. Kunz, finally made their position clear. While always reluctant to give a guarantee, if pushed I should agree a guarantee on their behalf for US$ 1 million. If, however, Owners still remaining adamant before fixing the vessel they had to have a guarantee for US$ 1.5 million I was authorized by Mr. Kunz to confirm it on Newco's behalf, there were no conditions attached.

Owners relied on the following aspects as being consistent with Mr. Kehr being accurate in the above evidence as to what Mr. Kunz had authorized him to do. First, at about mid-day on May 17 Newco evidently faxed to Zaco a draft of the guarantee referring to U.S.$1.5 m. (see pp. 83/84 of the Bundle). Second, on May 19 Newco wrote to Zaco requesting —

> . . . as per our telcon. kindly give us full style of headowners for guarantee for above mentioned vessel.

That led to a draft of the guarantee being produced as disclosed by Newco on discovery with the full name of the owners in it again referring to U.S.$1.5 m. (see p. 150). Thirdly, there was correspondence between Zaco, FCJ and Kilgours relating to whether the payment which Newco were going to make on behalf of KSH up to the amount of their freight commitment would be deducted from any liability under the performance guarantee (see e.g. pp. 207, 208 and 209). This in turn led to a draft of the guarantee being produced by Newco referring to credit being given under the guarantee for any payment made (see p. 242 in the Bundle). That form of draft referred to a charter-party dated May 17, 1993, and in that form it was communicated to Kilgours and by them to owners who requested the date to be changed from May 17 to 18. That request reached Newco who produced a draft with that date changed.

What however did not happen was that Newco ever provided a copy of the guarantee signed as the draft indicated that it would be.

Considerable negotiations then took place in relation to the obtaining of the completion cargo in relation to which no arrangements were ever made, so far as Newco were concerned, for the obtaining of any benefit therefrom and the question of any final execution of the guarantee just seems to have been forgotten. Mr. Kunz suggested in his statement that in June he was told by Mr. Kehr that the guarantee was no longer required; this seems to be somewhat inconsistent with what Mr. Kunz himself replied rather nearer the time when first asked to meet a liability on a guarantee. At that stage he stated that Newco had denied the existence of any guarantee. (See p. 10 of Bundle 6.)

My view on all of the above is as follows.

However unsatisfactory it may have been for owners, the only agreement that they ever had was between themselves and KSH that KSH would produce a performance guarantee. The negotiations between KSH and Newco reached a stage where KSH could be confident that Newco would produce a guarantee if necessary, because KSH was reasonably confident itself that it could see to it that Newco were liable for their own freight commitment and secured in relation to the balance up to U.S.$1.5 m. via a completion cargo. Newco were clear that they would produce a guarantee if it was asked for, and if, (as it expected), the arrangements were put in place so far as a completion cargo was concerned. All the above explain the production of the various drafts and the variation to the terms being drafted and shown to the various parties. In fact what appears to have ultimately happened is that the guarantee was never actually asked for. It was not for example forwarded by FCJ on June 9, 1993 with the charter-party (see p. 289). KSH also had some difficulty fixing the completion cargo. It was not actually fixed by June 9, 1993 (see p. 292). It may be at this stage that Mr. Kehr said to Mr. Kunz that he did not think a guarantee was going to be wanted. In any event, neither Mr. Kehr nor Mr. Kunz contemplated chasing up owners to see if a guarantee was still wanted. Possibly Mr. Kunz felt a little anxious, really appreciating that owners must have wanted a guarantee, and it is for that reason he used the word "deny" at p. 10 of Bundle 6.

In any event, what owners need to establish if they are to succeed, is an agreement between them and Newco. They certainly did not get that agreement as at the time they allege i.e. May 17, 1993. Such agreement as was reached was between KSH and owners, and possibly KSH and Newco. I am doubtful whether such agreement as was reached between KSH and Newco was more than a firm understanding binding in honour, but even if it were more, no guarantee was ever produced by Newco in favour of owners pursuant to whatever obligation Newco undertook vis-à-vis KSH. All Newco ever did was to produce drafts of what it would be prepared to sign.

In the result, points on the Statute of Frauds do not arise and the claim of owners against Newco must be dismissed.