KEANE & MARLOWE, LLP
Attorneys for Defendants
REPINTER INTERNATIONAL SHIPPING
CO. S.A. and MIACHART CORPORATION LLC
197 Route 18 South Suite 3000
East Brunswick, New Jersey 08816
(732) 951-8300
Mary Ann C. Marlowe (MM-0723)
Christopher P. Keane (CPK-4394)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

DEVAL DENIZCILIK VE TICARET A.S.,

                            Plaintiff,

-against-

REPINTER INTERNATIONAL SHIPPING
CO. S.A.  and MIACHART CORPORATION
LLC.,

                            Defendants.
-------------------------------------------------------------x

**REPLY DECLARATION OF
DAVID MARTIN SEMARK**


**07 Civil 3397 (JGK)**

**DAVID MARTIN SEMARK** pursuant to 28 U.S.C. §1746 hereby declares and says the following, under penalty of perjury:

1    I am a solicitor of the Supreme Court of England and Wales and a partner in the firm of Reed Smith Richards Butler LLP, in their London office situated in Beaufort House, 15 St Botolph Street, London EC3A 7EE.

2    I make this declaration based on the facts and matters within my own personal knowledge, and in response to certain points raised in the declaration of Mr Epaminondas Arghyrakis dated 29th June 2007, which I address below.

3    As a preliminary remark however, I address the point made in the final paragraph of point I on p. 5 of the Plaintiff's Response Memorandum of Law dated 29th June, in which it is stated that as a guarantor, Miachart can have no counter-claim of its own. I point out that under English law a guarantor may, on being sued for a liability of the principal debtor,

raise any right of set-off or counterclaim which the principal debtor could set off against the claimant (Halsbury's *Laws of England* vol. 20(1) para 223: exhibit 1). In this declaration therefore, references to "Charterers" or "Repinter" should be taken to include Miachart.

**THE CHARTER CHAIN**

4    As Mr Arghyrakis points out in paragraph 5 of his declaration, at the time that the events giving rise to Owners' claim and Charterers' counter-claim arose, the *Orhan Deval* was the subject of 3 charterparties. The charter "chain" looked like this:



The Charterparties are "back-to-back" in all material respects

5    The Repinter/BSC charter was set out in a fixture recap dated 15th November 2006 (exhibit 2), which amended some of the terms agreed between Deval and Repinter (none of which are material to the current claim and counter-claim) but otherwise incorporated the terms of Charterparty No. 1 wholesale into Charterparty No. 2 stating:

> "Otherwise as per Owners B-T-B Head C/P dtd April 13, 2006 other than logical alterations or unless already agreed in main terms…"

6    I respectfully submit that this disposes of the points made in paragraphs 16-19 of Mr Arghyrakis's declaration.

7    Not only were the terms the same between Charterparty No. 1 and Charterparty No. 2, but the redelivery dates and ranges were also back-to-back.

*The status of the London arbitration proceedings*

8    The factual disputes which have given rise to the claim and counter-claim under Charterparty No. 1, are common to all 3 charterparties. London Arbitration proceedings have been commenced under all 3 fixtures:

   (a)   On 10th July Deval appointed Mr Christopher Moss as Deval's nominated arbitrator in respect of all disputes in the Deval/Repinter/Miachart arbitration reference ("the head-reference") (exhibit 3).

   (b)   That same day, Repinter appointed Mr Moss as their arbitrator in respect of all disputes in the Repinter/BSC reference ("the sub-reference") (exhibit 4).

   (c)   I am advised by their lawyers that BSC then appointed Mr Moss as their nominated arbitrator in the BSC/Wajilam reference ("the sub-sub reference").

   (d)   On 11th July, I was advised by BSC's lawyers that they had been advised by Wajilam's lawyers that Wajilam would be appointing Mr Anthony Scott as their nominated arbitrator (exhibit 5). As I understand the position, Mr Scott has not yet been formally appointed in the sub-sub-reference (exhibit 6), Wajilam has until 24th July to do so, but as and when he is officially appointed, this appointment will be passed up the chain of arbitration references, so that the panel in all 3 references will be the same.

9    Mr Moss has accepted the appointments on the current London Maritime Arbitration Association ("LMAA") terms (exhibit 7).

10   This is the normal procedural arrangement for London maritime arbitrations involving, as is the case here, identical factual disputes. Clause 14(b) of the current LMAA terms gives the Tribunal the capacity to order that such references be heard concurrently, with a common procedural timetable and in circumstances such as the present, such orders are invariably made (exhibit 8).

11    Accordingly, as and when Deval presents their claim in the head reference (they have yet
to do so), the factual allegations will be passed down the chartering chain and the contrary
case passed upwards, in accordance with a common set of procedural directions from the
Tribunal, in the normal manner. The contentions made in this declaration wearing
Repinter's "charterers' hat" are naturally made without prejudice to any contentions they
may make in the sub-reference, in which Repinter will be wearing their "disponent owners'
hat".

12    However, when Mr Arghyrakis asserts in paragraph 22 of his declaration that
*"Repinter/Miachart are well aware that they will never be able to present any viable
counter-claims under English law"* because they had not, on 29th June *"asserted such
counterclaims"* in the *"ongoing arbitration between Deval and Repinter/Miachart"* he
failed to advise the Court that he had not, at that stage, even appointed an arbitrator on
Deval's behalf, still less served any claim submissions or evidence in those allegedly *"on-
going"* proceedings. Needless to say, no such inference can be drawn.

13    Equally, there is nothing *"telling"* (paragraph 14 of Mr Argyrakis's declaration) about the
fact that Repinter had not, on 29th June, commenced arbitration proceedings against BSC,
in circumstances where Deval had yet to appoint their arbitrator, let alone advance any case
in the arbitration which might give Repinter grounds to recover hire from BSC (which
Deval have still not done).

14    Accordingly, to the extent that Mr Arghyrakis describes the counter-claim as *"contingent"*
in paragraph 20 of his declaration, the same description could equally have been applied to
Deval's own claim, which had not, on 29th June, been expressed in anything other than the
New York security proceedings. Be that as it may, as arbitration proceedings have now
been commenced in all 3 references, I respectfully submit that the point is now moot.

15    As to securing BSC's counter-claim, BSC and Repinter have in principle agreed to
exchange security for the claim and counter-claim in the sub-reference subject to
agreement on wording and quantum. These discussions are continuing.

**THE FACTUAL DISPUTE**

16    As stated above, these are common to all 3 references. In summary, the dispute on the
      facts is as follows:

(a)    After delivery of the vessel to Wajilam under Charterparty No. 3, and in January
       2007, the vessel was ordered by Wajilam to load logs at Tanjung Manis and
       Bintulu in Malaysia and discharge these at Kandla, India.

(b)    It is common cause that some damage was caused to the vessel by the stevedores
       during the loading of the logs.

(c)    The extent of the damage is, however, in dispute between Owners and Charterers.

(d)    Charterers claim:

       (i)    That all the material stevedore damages were repaired when the vessel
              discharged the logs at Kandla, India, as set out in the attached Work Done
              Reports generated by the repair teams (exhibit 9).

       (ii)   That the remaining items of damage which Deval claims were caused by
              the stevedores, were either old damage, which the Deval is now
              illegitimately seeking to have repaired at Charterers' expense, or damage
              which was so minor that it must be classified as ordinary 'wear and tear'.

       (iii)  That Wajilam paid US$3,500 directly to the Master, after the conclusion of
              the discharge port repairs, and provided appropriate materials for the
              repairs, in full and final settlement of any remaining liability, on the basis
              that any remaining repairs would then be carried out by the crew.

       (iv)   This last assertion is set out in Wajilam's letter of 8th February 2007 which
              attached delivery receipts for the repair materials signed by the Master
              (exhibit 10).

(e)    Deval disputes these allegations and the stark conflict of evidence will have to be
       resolved by the Tribunal by witness evidence in the normal course. However,
       there is clear prima facie documentary support of Charterers' position.

(f)    Following discharge at Kandla, the vessel loaded further cargo for Adabiya,
       Egypt. While at Adabiya, and from on or about 4th April onwards, Deval claimed

that further repairs of alleged "stevedore" damage were necessary and demanded that Charterers repair these prior to the vessel leaving Adabiya.

(g)     Charterers took the view that these were not their responsibility because:

        (i)       All the material stevedore damage had been repaired in Kandla.

        (ii)      The Master had accepted USD3,500 in full and final settlement of any repair claim.

        (iii)     Deval were not able to cross-reference the repairs allegedly required by Class at Adabiya to the alleged remaining stevedore damage incurred at Tanjung Manis and Bintulu.

        (iv)     Deval were therefore demanding that Charterers repair old damage not caused by the Charterers, or "wear and tear", which was properly for Deval's account.

(h)     Nevertheless, under protest, BSC agreed to conduct the repairs identified by Class as being immediately necessary prior to the vessel's sailing (exhibit 11) and obtained quotes from local repairers to do so (exhibit 12).

(i)      However, the evidence of the local agents at Adabiya is that the Master/Deval deliberately obstructed these repairs and insisted that all the alleged "stevedore damage" be repaired, not simply those items identified by Class as being necessary prior to the vessel's sailing (exhibit 13).

(j)      It was this continuous obstruction, over an 18-day period, which led to BSC treating Charterparty no. 2 as being discharged on 22nd April, on the basis that the Master/Deval's conduct constituted a repudiation of the Charterparty (exhibit 14).

17      In paragraph 25 of his declaration, Mr Arghyrakis repeats the assertion that Repinter then abandoned the vessel after BSC asserted that they were discharged from the sub-charter. This was not the case.

18      Faced with BSC's termination, Repinter had 2 options:

     (a)     to terminate the head charter on the same grounds as BSC,

(b)      or, to keep the head charter in place, and claim damages arising out of Deval's breach of Charter at a later date.

19    Repinter chose option (b). Even though BSC had terminated the sub-charter, Repinter told Deval on 24th April that they were willing to carry the repairs necessary to allow the vessel to sail (albeit under protest and with full reservation of their right to claim damages) (exhibit 15).

20    Deval replied saying that the repairs would now be done by the crew and that the vessel would be taken off to drydock (exhibit 16). These repairs were complete 2 days later on or about 27th April (presumably using the materials and funds provided by Wajlam at Kandla for this very purpose).

21    Deval then sailed the vessel to Gulluk, Turkey to carry out further work on the vessel (which Charterers say must have been completely unrelated to the alleged stevedore damage), following which the vessel was delivered into alternative employment for other charterers on or about 5th May, bringing the charter with Repinter to an end.

**REPINTER'S COUNTERCLAIM**

22    I do not understand it to be in dispute that the Charterers (i.e. both BSC and Repinter) did not have the use of the vessel between 4th April – 5th May, i.e. the period over which Deval withheld the vessel's services and wrongfully insisted that Charterers repair all the alleged "stevedore damage" and while Deval carried out further work on the vessel at Adabiya and/or Gulluk.

23    Following on from paragraph 5 above, common to both Charterparty No. 1 and No. 2, (see exhibit 1 to Mr Arghyrakis's declaration) were:

(a)      Clause 32: the stevedore damage clause.

(b)      Clause 8: which obliged the Master to keep the vessel in Charterers' employment and follow Charterers' orders.

24    On Charterers' case, both clauses were breached by Deval, which in turn placed Repinter in breach of Charterparty No. 2.

25    The liability regime for stevedore damage created by clause 32 was as follows - Deval undertook not to make any claim for stevedore damage repairs at all:

    (a)    if the relevant notification requirements had not been complied with (in respect of which Charterers' position is reserved); or

    (b)    if the damage was ordinary "wear and tear".

26    Deval further undertook only to call on the Charterers to repair stevedore damage before redelivery of the vessel if the damage affected the vessel's seaworthiness, trading capabilities and/or crew safety and expressly agreed that all other stevedore damage would be repaired after redelivery, at the next scheduled dry-docking, in which case Charterers would only be liable for the cost of repairs, not for any time lost.

27    Accordingly, if the Tribunal accepts Charterers' case that:

    (a)    all the stevedore damage affecting the vessel's seaworthiness, trading capabilities and/or crew safety had already been repaired in Kandla at Charterers' time and expense; or

    (b)    the Master accepted USD3,500 in full and final settlement of any remaining repair claim on Deval's behalf; or

    (c)    Deval were demanding at Adabiya that Charterers repair old damage, unconnected with the stevedore damage; or

    (d)    the damage at Adabiya was "wear and tear"; or

    (e)    Deval and the Master deliberately obstructed the repairs which Charterers stood ready to do under protest; or even that

    (f)    Deval's initial refusal to do the repairs themselves represented a failure of their obligation to mitigate damages;

then, on any one or all of these grounds, the vessel will have been wrongfully withheld from Charterers' service from 4th April, in breach of clause 32 and clause 8 of both charters, because Deval will have wrongfully insisted on Charterers performing and carrying out repairs which were not:

    (i)    stevedore damage and/or

    (ii)    were nothing more than wear and tear; and or

    (iii)    did not affect the Vessel's seaworthiness, trading capabilities and/or crew safety.

28    As to Repinter and BSC's right to withhold hire, under English law, irrespective of any express off-hire provisions in a charterparty, a charterer has a right to withhold hire where the breach of a shipowner has deprived or prejudiced him in the use of the ship (the so-called right of "equitable set-off") (Scrutton, *Charterparties and Bills of Lading* 20th Ed. Art 174 pp 351-352: exhibit 17).

29    Moreover, clause 34 of both Charters provided that:

    *"... in the event of loss of time either in port or at sea ...by any refusal of the Master or crew to perform their duties, the hire shall be suspended..."*

30    Accordingly, both under the express terms of clause 34, and pursuant to Charterers' right of equitable set-off, in the event of any one of the findings listed in paragraph 27(a)-(f) above, then, prima facie, BSC will be entitled to:

    (a)    retain the US$556,127 in hire withheld by BSC from Repinter from 4th April onwards; and

    (b)    subject to proof of quantum, BSC's counter-claim of US$390,322 should succeed.

31    I respectfully submit that Repinter and Miachart are therefore entitled to be secured by Deval for these sums, together with interest and costs.

32    This is because under English law, all an innocent party's losses are recoverable from a contract breaker unless they are too remote. In circumstances where the liability

framework is back-to-back, and Deval and Repinter agreed at the time of contracting that Repinter was allowed to sub-charter the vessel,[1] Owners will be taken by the Tribunal to have foreseen that by depriving Repinter of the vessel's services, Deval would also place Repinter in breach of any sub-charter, which breach would deprive them of their right to earn hire under the sub-charter and expose them to a claim for wrongful deprivation of the vessel's services from the sub-charterers.

33    In the circumstances, Mr Argyrakis's non-sequitur at paragraph 15 of his declaration that *"under English law ... Deval could never be held liable to Repinter..."* and his remark in paragraph 21 that the counter-claims *"do not appear to be related to any breach by Deval of the provisions of its contract with Repinter"* or that (at paragraph 12) *"a giant leap"* is required to explain why Deval's breaches could cause Repinter to be in breach of the sub-charter are all equally unsustainable.

34    In fact, BSC have made it absolutely clear that it is Deval's actions, and those of the Master (their employee) which have caused Repinter to be in breach of Charterparty No. 2. On 24th April BSC's lawyers wrote to me in the following terms:

> *"...It will come as no surprise to you that our clients' decision taken on Sunday was not taken lightly. Our clients having taken every possible step to arrange repairs of the vessel.*
>
> *We hope that you will not be surprised that we do not accept the Master's version of events. This is not the first time this has happened on this charterparty. Very extensive efforts were made by Mostafa L. Hamamsy as club correspondent to seek and obtain various repair quotes and it is our clients' position that the Master at all material times did seek to obstruct the repairs. Had he not done so the repairs would have been completed some time ago.*
>
> *You say charterers are repudiatory; we disagree. Whether or not Charterers conduct is repudiatory will in due course turn upon the attitude of the Master since the initial repairs were first demanded.*
>
> *As to the material allegations in relation to the Rule B attachment, our clients have correctly calculated the termination date of the charterparty as 22nd April and have not purported in their final hire statement to suggest that any hire has*

---

[1] Exhibit 1 to Mr Argyrakis's affidavit, line 16 *"Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter..."*

- 10 -

*been paid which has not been paid. If charterers are correct in the contentions the vessel has been off hire since 4th April.*

*Furthermore, in the event that Owners are in repudiatory breach as Charterers' allege, they are entitled to throw the charterparty up as is where is and as such do not need to give credit for the US$130,000 in Suez Canal transit fees.*

*It follows therefore that the factual allegation, as will be proved in due course, that Charterers were arranging sufficient repairs for the vessel to sail is indeed true, and it became apparent only over the weekend, after the filing of the papers in New York, that to arrange the repairs necessary to enable the vessel to sail would be impossible given the Master's conduct.*

*Naturally we shall seek our clients' instructions in relation to your demand for security which was, of course, anticipated and **of course our clients regret that it has come to this. This has not been due to any fault of theirs nor, our clients accept, any direct fault of your clients. However the factual complications surrounding the events at Kandla and at Adabiya are patent for all to see.***

*In these circumstances, it remains our view that our clients have validly terminated and nothing will change our mind on that; please be guided accordingly.*" (exhibit 18: my emphasis)

35  As to the allegation in paragraphs 13 and 25 of Mr Arghyrakis's declaration that Repinter "accept" that the vessel remained on-hire at Adabiya and during the journey to, and the repairs at, Gulluk, as Mr Arghyrakis knows full well, Repinter's contemporaneous (and current) position was that any hire paid by Repinter would be paid under protest, and without prejudice to Repinter's right to claim this back as damages, on the basis that Deval was not entitled to hire (exhibit 19).

36  To the extent that Repinter recovers hire already paid to Deval in the London arbitration, this will be credited against the claim for hire lost under the sub-charter with BSC. At present however, Repinter is exposed in both directions – they have paid hire to Deval (under protest), and have fully secured Deval's own claim, but Deval are refusing to counter-secure Repinter for the hire withheld, and the claim advanced by, BSC because of Deval's actions.

- 11 -

**QUANTUM OF COUNTER-SECURITY**

37    At paragraph 10 of his declaration, Mr Arghyrakis states that no breakdown has been given of the US$556,127 in hire withheld by BSC. The same criticism can be levied against Deval's own security demand in these proceedings. Nevertheless, a breakdown showing the hire withheld by BSC is attached (exhibit 20).

38    As I understand BSC's position, in summary, (and as set out further in paragraphs 23-34 above) it is that they are not obliged to pay this sum because:

(a)    Deval (for whose conduct, as Disponent Owners, Repinter are vicariously liable) deprived BSC of the use of the vessel from 4th April onwards; entitling BSC to withhold hire either under clause 34 of the Charter and/or pursuant to their right of equitable set-off, and

(b)    because, as of 22nd April, they accepted Deval's conduct as repudiation of the Sub-Charterparty which released them from their remaining contractual obligations, including any obligation to pay for hire, redelivery bunkers and/or Suez canal transit fees.

39    As to the allegations in paragraphs 23-27 of Mr Arghyrakis's declaration that Repinter is already partially secured:

(a)    It is not the case that the Suez canal dues, redelivery bunkers, barges and port dues are "admitted" to be due, in the sense of payable, to Deval.

(b)    Repinter admits that for pure accounting purposes, and as part of the mathematical exercise in reconciling the fixture accounts *before* taking any claims for damages into account, Deval is entitled to:

(i)    a credit of US$80,616 in respect of 230.344 mts of IFO supplied to the vessel at the charterparty price of USD350 (not the US$135,213 claimed by Mr Arghyrakis), and

(ii)    subject to proof of quantum, the Suez canal dues, in the sum of US$102,700.[2]

Nevertheless, even taking these items into account, and leaving aside all BSC's claims for damages and/or off-hire or deductions from hire, and Repinter's loss of profit on Charterparty no. 2, Deval owe Repinter USD103,527 in accordance with Repinter's' preliminary final statement (exhibit 21)

40    However it does not follow that the Suez canal dues and redelivery bunkers should be excluded from Repinter and Miachart's security request, for 2 reasons:

(a)    First, if the Tribunal holds in the sub-reference that Deval's conduct entitled BSC to repudiate the sub-charter (on the basis that Repinter were vicariously liable for Deval's actions), then, as BSC's lawyers have already intimated in their email of 24th April (exhibit 18), Repinter will not be able to recover Suez canal dues and redelivery bunkers from BSC (because on acceptance of a repudiation an innocent party is released from his further contractual obligations under English law). For this reason, these items will be claimed back from Owners as additional damages, in the alternative, when Repinter and Miachart submit their defence in the head reference, once Deval have served their claims submissions.

(b)    Secondly, Mr Arghyrakis has previously advised me by telephone that he intends to apply for a summary Interim Final Award in the head reference for payment of these sums which application, if successful, would leave Repinter unsecured in like amount.

41    Mr Arghyrakis's further claim in paragraph 24 that US$118,646 in bunkers on redelivery represents *"a further amount undoubtedly due to Deval"* is a classic example of "double-dipping" – he has already argued in sub-clause 23(ii) of his declaration that Owners are owed USD135,213 in redelivery bunkers, and to claim an additional USD118,646 for the same item is double-counting.

42    As to paragraphs 25 – 26 of Mr Arghyrakis's affidavit, no hire is due to Owners from 4th April onwards, and no funds have been "wrongfully withheld". However, Repinter concedes that a small adjustment to the security request in the sum of US$78,540, is needed to reflect the fact that there is an overlap between the hire withheld by BSC

---

[2] Charterers disclaim any liability for the costs for "Barge" and "Port Dues" in sub-paragraphs 23(iii) and (iv) of Mr Arghyrakis's declaration.

between 26th April – 5th May and Repinter's corresponding deduction under the head charter. Accordingly, the amount of counter-security requested falls to be reduced from US$1,500,326 to US$1,421,786.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London, United Kingdom
19th July 2007

DAVID MARTIN SEMARK